Frederick J. Odsen
ABA No. 7906043
Carl J.D. Bauman
ABA No. 7310038
Hughes Bauman Pfiffner Gorski & Seedorf, LLC
3900 C Street, Suite 1001
Anchorage, AK 99503
Telephone Number:    (907) 274-7522
Facsimile Number:    (907) 263-8320

Attorneys for Defendant Tesoro Alaska Company

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| MANUMITTED COMPANIES, INC., |  |
| Plaintiff, |  |
| vs. |  |
| TESORO ALASKA COMPANY, |  |
| Defendant. | Case No. A05-185CV.(TMB) |

## **OPPOSITION TO MOTION TO COMPEL**

Opposition to Motion to Compel
*Manumitted Companies, Inc. v. Tesoro Alaska Company*
Case No. A05-185 CV.[TMB]
Page i of iii

# TABLE OF CONTENTS

**Page**

Background .................................................................................................. 2

Procedural Context ....................................................................................... 4

Procedural Context of Protective Order ........................................................ 6

The Applicable Law with Respect to Tesoro's Attorney-Client and
Work Product Privilege ................................................................................ 7

   1.  Alaska Law With Respect To Attorney Client Privilege ........................ 8

   2.  Washington Law With Respect To Attorney Client Privilege .............. 12

   3.  Texas Law With Respect To Attorney Client Privilege ....................... 14

   4.  Application Of Alaska's Choice Of Law Rules Re Attorney Client Privilege ....... 15

   5.  Applicable Federal Law With Respect To FRCP 26 And Work Product
      Protection .................................................................................... 24

      a.  Opinion Work Product Is Afforded Near Absolute Protection ......... 25

      b.  The Investigation Was Undertaken In Anticipation Of Litigation. ......... 28

      c.  Manumitted Will Not Be Able To Carry Its Burden Of Showing
         Substantial Need And Undue Hardship Pursuant To FRCP 26(B)(3) ......... 29

Attorney-Client and Work Product Privileges Applied to the Tesoro Documents ......... 32

   1.  Amended Privilege Log ..................................................................... 32

   2.  The withheld communications are between control group members and
      subject to the attorney client and work product privileges .................. 32

      a.  Withheld communications are among control group members ......... 33

Opposition to Motion to Compel
*Manumitted Companies, Inc. v. Tesoro Alaska Company*
Case No. A05-185 CV.[TMB]
Page ii of iii

      b.  The subjects of withheld communications are within the attorney-client
         and work product privileges.........................................................................35

Communications To and From Outside Counsel.............................................................36

Tesoro Internal E-mails With In House Counsel Pertaining to Claims by and
Between Tesoro and Manumitted Are Privileged ...........................................................37

Tesoro Internal E-mails Relative to the Negotiation and Preparation of the
Service Oil & Gas, Inc. Distributor Assistance Agreement are Privileged .....................40

Tesoro Properly Withheld or Redacted Materials That Contained Information About
Third Parties or Customers That is Not Relevant to the Manumitted Litigation ..............41

Tesoro's Refusal to Produce Propriety Information is Justified ......................................42

Notwithstanding the Existence of the Protective Order, the Product Sales
Volume and Margin Data Must Not Be Disclosed..........................................................45

Conclusion ....................................................................................................................47

Opposition to Motion to Compel
*Manumitted Companies, Inc. v. Tesoro Alaska Company*
Case No. A05-185 CV.[TMB]
Page iii of iii

COMES NOW defendant, Tesoro Alaska Company ("Tesoro"), by and through its counsel of record, Hughes Bauman Pfiffner Gorski & Seedorf, LLC, and states its opposition to Plaintiff Manumitted Companies, Inc.'s ("Manumitted") Motion to Compel dated May 2, 2006.  Notwithstanding Manumitted's protestations to the contrary, Tesoro has in good faith and in a timely fashion provided Manumitted with proper, substantial and meaningful initial disclosures (which is in fact not the case with respect to Manumitted).  Similarly, Tesoro has provided Manumitted with proper, substantive and timely discovery responses as well as detailed, forthright and extensive privilege logs.[1] Despite the tone of the motion to compel, Tesoro's actions in making disclosures and responding to discovery are, and have been timely and in good faith.

It is the case, however, that Tesoro and Manumitted do not agree as to certain issues, principally with regard to the scope of the applicable attorney-client privilege (and apparently the work product privilege) especially with reference to email communications from and to Tesoro's in-house counsel and key Tesoro executives and personnel involved in this matter.  Tesoro and Manumitted also disagree relative to Manumitted's right to review certain information principally pertaining to gasoline product volumes sold by one of Manumitted's competitors in Valdez, Gas, Inc., d/b/a Captain Joe's.  Tesoro has some of that product and sales volume by virtue of its

---

[1] As is noted hereinbelow, Tesoro also is submitting herewith amended privilege logs providing even more detail.

Opposition to Motion to Compel
*Manumitted Companies, Inc. v. Tesoro Alaska Company*
Case No. A05-185 CV.[TMB]
Page 1 of 48

agreement with a Tesoro branded distributor, Service Oil & Gas, Inc., which sells petroleum products to Gas, Inc.  Tesoro does not sell petroleum products to Gas, Inc. d/b/a Captain Joe's.  This court has in its Order Re: Motion to Quash dated February 8, 2006 (Docket Entry 17) ruled that such product volume information was not required to be produced to Manumitted by Gas, Inc.  This court so ordered notwithstanding the existence of the Protective Order dated January 23, 2006 in this case noting that the disclosure of such information posed a risk to Gas, Inc. d/b/a Captain Joe's of an unfair business advantage in the future inuring to the benefit of Manumitted.  A similar risk exists with respect to Tesoro's business interests that in the circumstances of this case which justifies non-disclosure of such is proprietary and confidential information.

## BACKGROUND

Tesoro and Manumitted (formerly known as Harbor Fuel Co., Inc.) have had a lengthy and somewhat financially convoluted business relationship.  Manumitted was prior to the Exxon Valdez oil spill, a Tesoro branded distributor of petroleum products including not only gasoline, but heating oil and lubricants.  Manumitted at that time had both wholesale and retail petroleum sales businesses.  As a result of the Exxon Valdez oil spill and the resulting spike in economic activity in Valdez, Manumitted's sales volume shot up dramatically, as did its purchase of petroleum products from Tesoro.  Unfortunately, however, Manumitted materially defaulted in its obligations to Tesoro ultimately resulting in its first Chapter 11, In re: Harbor Fuel Co., Inc. a/k/a

<u>Wolverine Gas and Oil</u>, Case No. A-91-00815-HAR filed in 1991. In the context of that Chapter 11, Manumitted asserted various claims against Tesoro via an adversary proceeding (including price discrimination claims) which ultimately were resolved in Manumitted's Plan of Reorganization in that case. The Plan of Reorganization was confirmed on or about May 7, 1992. In the context of that bankruptcy case, Manumitted agreed to pay Tesoro an aggregate sum in the approximate amount of $1,600,000 on terms set forth in the Plan. The indebtedness was modified in 1995 when Manumitted executed an Amended and Restated Promissory Note in the stated amount of $1,157,544.65.

The Amended and Restated Promissory Note matured on or about January 1, 1998. Manumitted failed to pay that note at maturity and once again defaulted. In 1999, following the default, Manumitted and Tesoro agreed to a substantial restructuring of the remaining reorganized debt of Manumitted as well as amounts due for product sales by Tesoro to Manumitted. That restructuring included the sale of a number of Manumitted's assets, notably its hearing fuel and wholesale fuel business, to Service Oil & Gas, Inc. Manumitted also bought the gas station it had been leasing from Tesoro, and on April 23, 1999 executed a Promissory Note in the stated amount of $570,914.92 secured by a first Deed of Trust on the station. The Promissory Note called for monthly payments in the amount of $5,500.00 until May 1, 2009 when the Promissory Note matures. At the same time, Manumitted ceased being a Tesoro branded

distributor and became a Tesoro branded dealer under the terms of a non-exclusive Dealer Agreement dated April 23, 1999 (the "Dealer Agreement").

In late 2003 Manumitted breached the terms of the Dealer Agreement due to actions that included but are not limited to buying and selling non-Tesoro branded gasoline in violation of the terms thereof. Tesoro sent a Notice of Breach of Contract Dealer Agreement to Manumitted dated November 13, 2003, a copy of which is attached hereto as Exhibit A. Further, Manumitted breached the terms of the Promissory Note in or about March, 2004. Based on Manumitted's defaults with regard to the Promissory Note and the accompanying Deed of Trust, Tesoro caused a nonjudicial deed of trust foreclosure to be scheduled on October 14, 2004. That foreclosure was stayed by Manumitted's most recent Chapter 11 bankruptcy filed on November 29, 2004 in In Re: Manumitted Companies, Inc., Case No. A04-01318-DMD.

This lawsuit revolves around the breach by Manumitted of its obligations under the 1999 Dealer Agreement and the 1999 Promissory Note and related agreements, and Manumitted's assertions that Tesoro breached its obligations to Manumitted.

## PROCEDURAL CONTEXT

Manumitted suggests in the context of its recitation of "Background Facts" that Tesoro has unreasonably delayed its discovery responses. Tesoro strongly disagrees. Although Manumitted served its first set of discovery requests on Tesoro in September 2005, they were premature at that point. As set forth in the letter from the undersigned

counsel to Mr. Mills dated October 14, 2005, attached hereto as Exhibit B, and in the

Initial Objections and Responses to Plaintiff's First Discovery Requests propounded to

Defendant dated October 14, 2005 attached hereto as Exhibit C, the discovery responses

were not due by agreement of the parties until thirty (30) days after the exchange of

initial disclosures.  On or about January 6, 2006, the parties exchanged initial disclosures.

Manumitted's initial disclosures are attached as Exhibit D.   Manumitted's initial

disclosures were minimal at best and did not include any pertinent documentation

available except to the extent it was at the station in Valdez.  Tesoro, on the other hand,

had its documents bates numbered and available at the offices of undersigned counsel

with the exception of certain environmental files stored at Tesoro's offices in Auburn,

Washington.  Ultimately, all of these documents, including the environmental files, were

bates numbered and were personally hand delivered by undersigned counsel to Mr. Mills

on March 28, 2006.  Tesoro provided detailed privilege logs in connection with its initial

disclosures in which it asserted the attorney client and work product privileges.

Manumitted on April 28, 2006 provided Tesoro with a supplement to its disclosures

indicating that certain documents were available for review as set forth on Exhibit E.

Undersigned counsel reviewed those documents and advised Mr. Mills that Manumitted's

disclosures remain incomplete as evidenced by the letter dated May 5, 2006 attached as

Exhibit F.  Among documents that have not been provided with Manumitted's initial

disclosures are financial documents, payroll reports, tax returns and general ledger detail

for the key years of 2001 through 2005 (a period during which Manumitted alleges it sustained losses due to Tesoro's actions), and a meaningful articulation of Manumitted's alleged damages.

Notwithstanding Manumitted's inadequate and incomplete disclosures, Tesoro has in good faith responded to the discovery requests and done so in a manner that is timely in the circumstances. Tesoro provided the responses to Manumitted's first discovery requests on April 19, 2006, although Manumitted had access to the overwhelming bulk of the documents and had received Tesoro's initial disclosures and Tesoro's privilege log in January.[2] Manumitted did not object to the contents of the Tesoro privilege log until April.

## PROCEDURAL CONTEXT OF PROTECTIVE ORDER

Manumitted seeks to take Tesoro to task for not producing sensitive proprietary information notwithstanding the terms of the Protective Order. Tesoro wishes to point out, however, that in propounding the Protective Order Tesoro stated that notwithstanding its terms, some information could well be irrelevant to the issues or

---

[2] Undersigned counsel would also point out that his mother became critically ill, was hospitalized for seventeen days, and died in Washington State on January 17, 2006, necessitating periods out of the office in January, February, April and May 2006. Mr. Mills was aware of those circumstances and, consistent with the long professional relationship we have had on opposite sides of cases, was courteous and understanding for which the undersigned is appreciative. The deadline imposed, however, by his April 11, 2006 letter to respond to Manumitted's objections to the Tesoro privilege log were not reasonable in the circumstances or in light of the complexities presented.

Opposition to Motion to Compel
*Manumitted Companies, Inc. v. Tesoro Alaska Company*
Case No. A05-185 CV.[TMB]
Page 6 of 48

proprietary such that redacting the information or withholding it would be justified.  See letter dated January 6, 2006 attached as Exhibit G.  Manumitted's point was that while the Protective Order protects information relating to third parties and otherwise that should not be in the public record, the Protective Order did not mandate Tesoro's disclosure of sensitive business and propriety information.  Further, the Protective Order was entered before this court entered its Order Re: Motion to Quash in which as noted, the court itself questioned the adequacy of a protective order to adequately protect parties in interest from the disclosure of sensitive business information.  For Manumitted to suggest that Tesoro should be sanctioned for redacting or withholding such propriety information in these circumstances is wholly unjustified.  Tesoro has been forthright, given full disclosure, and done its best to anticipate and resolve issues pertinent to disclosures of documents and information.

## THE APPLICABLE LAW WITH RESPECT TO TESORO'S ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGES

Many of the business decision makers of Tesoro are located in Auburn, Washington or Texas, so some of the privileged communications occurred and documents were prepared in a jurisdiction other than Alaska.  These circumstances require an analysis of the choice of law rules for Alaska, since the law of the state in which the federal court sits under diversity jurisdiction usually controls the admission of evidence, including the law of privilege.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313

U.S. 487 (1941); <u>Frontier Refining Inc. v. Gorman-Rupp Co.</u>, 139 F.3f 695, 702 n.10 (10th Cir. 1998) and <u>Boyd v. City and County of San Francisco</u>, 2006 U.S. LEXIS 27647 at 10, (N.D. Cal. 2006).

On the other hand, all of the law applicable to work product in a case based upon diversity jurisdiction is federal common law, which has developed around <u>Hickman v. Taylor</u>, 329 U.S. 495 (1947) and Fed. R. Civ. P. 26. <u>Id.</u>

### 1. **Alaska Law With Respect To Attorney Client Privilege**

The attorney-client privilege in Alaska is set forth in Alaska. R. Evid. 503 in pertinent part as follows:

(a) Definitions.  As used in this rule:

(1) <u>A client is a</u> person, public officer, or <u>corporation,</u> association, or other organization or entity, either public or private, <u>who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services.</u>

(2) <u>A representative of the client is one having authority to obtain professional legal services and to act on advice rendered pursuant thereto, on behalf of the client.</u>

(3) A lawyer is a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation.

(4) A representative of the lawyer is one employed to assist the lawyer in the rendition of professional legal services.

(5) <u>A communication is confidential if not intended to be disclosed to third persons other than those to whom disclosure</u>

> is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.
>
> (b) General Rule of Privilege.  A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, or (2) between the client's lawyer and the lawyer's representative, or (3) by the client or the client's lawyer to a lawyer representing another in a matter of common interest, or (4) between representatives of the client or between the client and a representative of the client, or (5) between lawyers representing the client. … [Emphasis added.]

See generally, Matter of Mendel, 897 P.2d 68, 73-74 (Alaska 1995).

Under the foregoing definitions and statement of the substance of the privilege, Tesoro is the client, and the corporate officers, managers and other Tesoro employees identified in its initial disclosures are "representatives of the client," provided that (1) they have the authority to obtain legal services and to act on the advice rendered on behalf of the client and (2) all communications are confidential and are not intended to be disclosed to third persons "other than to those to whom disclosure is in furtherance of the rendition of professional legal services to the client."

Although the Evidence Rules Commentary for Evidence Rule 503 speaks in terms of a control group test to determine the identity of those employees and agents of a corporate client who would be considered to be "representatives of the client," the rule

defines who the members of the control group are through the use of the unambiguous definition of "representative" found in Evidence Rule 503(a)(2), to the extent that Alaska's law of privilege applies, rather than the privilege law of the State of Washington, as discussed hereinafter.

While in some cases, only the most senior level management would have the authority to seek legal advice and to act upon it, and therefore constitute the control group as defined in Alaska Evid. R. 503, when the nature of the business and the specific authority of the employees or agents of the client indicate otherwise, the suggestion in the commentary that Alaska adopted the control group approach does not change the fact the makeup of the control group is defined in the rule.   Therefore, application of the definition can lead to an atypical control group result in some circumstances but that result is still consistent with the language and purpose of the privilege.[3]  If this was not an intended result from the clear language of the rule, the Alaska Supreme Court, in

---

[3] The holding in <u>Langdon v. Champion</u> does not require a different result.  The issue in <u>Langdon</u> was whether the insurer was a representative of the client within the meaning of Evidence Rule 503. After analyzing the role of a liability insurer, the court held that investigating claims is an ordinary and customary part of the insurance business and therefore falls outside of the protection of the attorney-client privilege and work product doctrine. Id. at 1004, 1007. The court was also concerned about the judicial policy implications that would result if all insurance company investigations were insulated from routine discovery.  Id. The issue in the instant case is whether certain  managers of certain departments, such as credit managers employed by Tesoro, where Tesoro is the client, are "representatives' of Tesoro for the purposes of Alaska Evidence Rule 503. This is a fact specific inquiry within the confines of Alaska Evidence Rule 503.

adopting Evidence Rule 503, could have easily limited the definition of a representative of a corporate or institutional client to its senior level officers. The Alaska Supreme Court did not so limit the definition of "representative."

In the context of Tesoro Corporation and its subsidiaries operating in Alaska, those Tesoro managers and officers working in Alaska and those Tesoro managers, officers and other individuals in the Auburn, Washington office or in Texas whose duties include Tesoro's operations in Alaska, the control group is made up of Tesoro personnel who qualify as representatives of the client (Tesoro) under Alaska Evid. R. 503 with hands on involvement with Alaska. As noted in the affidavit of Donald Reese, these are the individuals who have the authority to communicate directly with Tesoro in house counsel, to request legal services and legal advice from in house counsel and can act on that advice on behalf of Tesoro Corporation or its subsidiaries. The usual practice is for in house counsel for Tesoro to retain the services of outside counsel (if needed), but these same officers, managers, and other individuals can request that outside counsel be retained, can request legal services and legal advice from outside counsel and can act on that legal advice on behalf of Tesoro and its subsidiaries. For purposes of the application of the attorney/client privilege, it is immaterial that the lawyer involved is in house counsel rather than outside counsel. Allstate Ins. Co. v. Herron, 393 F. Supp 2d 948, 956-957 (D. Alaska 2005).

Therefore, for the purpose of this motion, the court must consider the privilege to extend to all representatives of Tesoro with the authority to request and act upon legal advice, even if that advice is provided by in house counsel.  In this case, that includes the parties to the pertinent e-mails and communication in the Amended Privilege Log.  See the Affidavit of Donald Reese.

**2.   Washington Law With Respect To Attorney Client Privilege**

In the event that this court does not agree with the foregoing  analysis of the attorney  client privilege under Alaska law with respect to the  those individuals with authority to request legal services and legal advice and to act on that advice on behalf of their respective Tesoro subsidiary, then there is a conflict between Alaska privilege law as the law of the forum and Washington and Texas privilege law, as the law of the place where the communications took place.

The attorney client privilege in Washington currently takes the form of a statute, RCW §5.60.060 (2)(a)  which provides as follows:

> An attorney or counselor shall not, without the consent of his
> or her client, be examined as to any communication made by
> the client to him or her, or his or her advice given thereon in
> the course of professional employment.

The foregoing statement of the privilege  has been developed over the years by decisions of the Washington Appellate Courts.  In Dietz v. Doe, 935 P.2d 611, 615-616  (Wa.

1997), the Washington Supreme Court affirmed the general rules applicable to the attorney client privilege in Washington as follows:

> The attorney-client privilege exists in order to allow the client to communicate freely with an attorney without fear of compulsory discovery. The attorney-client privilege applies to communications and advice between an attorney and client and extends to documents that contain a privileged communication. …
>
> The initial inquiry for purposes of <u>RCW 5.60.060(2)</u> is whether an attorney-client relationship or other protected relationship exists. "An attorney-client relationship is deemed to exist if the conduct between an individual and an attorney is such that the individual subjectively believes such a relationship exists." However, the belief of the client will control only if it "is reasonably formed based on the attending circumstances, including the attorney's words or actions." The determination of whether an attorney-client relationship exists is a question of fact. The burden of proving the existence of the relationship and that the information the Dietzes sought fell within the privilege rested squarely with Doe. [Emphasis added, citations and footnote references omitted.].
>
> The court also discussed the possible impact of waiver on the privilege as

follows:

> The attorney-client privilege can ordinarily be waived only by the client, to whom the privilege belongs However, when the attorney "is authorized to speak and act for the client on particular matters, disclosures by the attorney that are within the scope of that authority waive the privilege to the same extent as disclosures by the client." Additionally, waiver may occur when the communication is made in the presence of third persons on the theory that such circumstances are inconsistent with the notion the communication was ever

intended to be confidential. [Emphasis added, citations and footnote references omitted.].

Id. at 618-619. The court then adopted the "legal advice" exception to the general rule that the identity of the client is not privileged, which was the primary issue in that case. Id.

The statement of the Washington attorney client privilege contained in RCW 5.60.060(2)(a) is virtually identical to the attorney client privilege in Alaska in Civil Rule 43(h)(2) which preceded the adoption of the current Alaska Rules of Evidence. See American National Watermattress Corp. v. Manville, 642 P.2d 1330, 1333 (Alaska 1982). This language of RCW 5.60.060(2)(a) has been interpreted by the Washington Supreme Court to include within a corporation's "control group" lower level employees, at least to the same extent as was discussed in Upjohn Co. v. United States, 449 U.S. 383, 394 (1981). See Wright v. Group Health Hospital, 691 P.2d 564, 566 (Wash. 1984).

**3.  Texas Law With Respect To Attorney Client Privilege**

Effective as of March 1998, Texas changed from a "control group" state to one utilizing the subject matter test introduced in UpJohn Co. v. United States. See In Re Avantel, S.A., 343 F.3d 311, 315 (5th Cir. 2003). The parameters of the revised Texas privilege law were set out in In Re E.I. Dupont De Nemoirs and Co., 136 S.W.3d 218, 226 fn. 3 (Texas 2004) as follows:

n3 Connor did not specifically assert that each recipient was a DuPont supervisor. However, for attorney-client privilege, the

subject matter test has replaced the control group test pursuant to the amendment of <u>Rule of Evidence 503</u>. TEX. R. EVID. 503(a)(2) & cmt; <u>Nat'l Tank Co. v. Brotherton</u>, 851 S.W.2d 193, 197-98, 36 Tex. Sup. Ct. J. 715 (Tex. 1993). <u>The subject matter test is met where "the employee makes the communication at the direction of his superiors in the corporation and where the subject matter upon which the attorney's advice is sought by the corporation and dealt with in the communication is the performance by the employee of the duties of his employment." <i>Nat'l Tank</i>, 851 S.W.2d at 198</u>. As such, the attorney-client privilege may apply to communications between attorneys and employees who are not executives or supervisors. [Emphasis added.]

Since many, if not most of the communications being withheld by Tesoro on the basis of attorney client privilege originated in the States of Washington or Texas or took place in the States of Washington or Texas, then the more liberal privilege law of Washington or Texas should apply.

### 4. <u>Application Of Alaska's Choice Of Law Rules Re Attorney Client Privilege</u>

The federal mandate requiring the application of Alaska law in an action based on diversity jurisdiction, includes not only substantive Alaska law, but also Alaska's rules regarding choice of law. The Alaska Supreme Court has customarily commenced its analysis of choice of law with the Restatement (Second) Conflict of Laws. <u>See</u> <u>Long v. Holland America Line Westours, Inc.</u>, 26 P.3d 430, 431-434 (Alaska 2001) and <u>Savage Arms, Inc. v. Western Auto Supply Co.</u>, 18 P.3d 49, 53 (Alaska 2001). The court addressed its procedure in <u>Savage Arms</u> as follows

We look to the Restatement (Second) of Conflict of Laws for guidance in resolving choice-of-law issues. (FN8) The Second Restatement requires a separate choice-of-law analysis for each issue presented. (FN9) We likewise follow this rule of dépeçage, (FN10) and determine the proper choice of law on the issue of successor liability without regard to other issues in the case.

Footnote 9 provides:

(FN9.) See Restatement (Second) of Conflict of Laws § 145 cmt. d (1971) ( "The courts have long recognized that they are not bound to decide all issues under the local law of a single state."); Ruiz v. Blentech Corp., 89 F.3d 320, 324 (7th Cir.1996) (holding that under the Second Restatement test, "[a] court therefore conducts a separate choice-of-law analysis for each issue in a case, attempting to determine which state has the most significant contacts with that issue.").

The issue in <u>Savage Arms</u> was the applicable law with respect to successor liability upon the sale or transfer of assets or stock from one entity to another and the issue in <u>Long v. Holland America Line Westours, Inc.</u> was the enforceability of a contract provision limiting the time available to bring claims for bodily injury based on negligence, which involved the analysis of Restatement (Second) of Conflict of Laws §187. The applicable section of the Restatement with respect to privilege is §139 which provides in pertinent part as follows:

### §139.  Privileged Communications
…
(2)     Evidence that is privileged under the local law of the state which has the most significant relationship with the communications but which is not privileged under the local

law of the forum will be admitted unless there is some special reason why the forum policy favoring admission should not be given effect.

The comments to §139(b) shed some light on the potentially differing interests between the forum state, in this case, Alaska, and the state that has the most significant relationships with the communications, which will in most instances be the State of Washington.  See Comment e. (The state which has the most significant relationship with a communication will usually be the state where the communication took place.).

Comment d provides in pertinent part as follows:

> Among the factors that the forum will consider in determining whether or not to admit the evidence are (1) the number and nature of the contacts that the state of the forum has with the parties and the transaction involved, (2) the relative materiality  of the evidence to be excluded, (3) the kind of privilege involved and (4) fairness to the parties

Analysis of these factors in the context of the dealership defaults by Manumitted and the alleged bad faith on the part of Tesoro are not particularly helpful. The reason for the attorney client privilege in the first instance is to provide a legal environment  which is conducive to a confidential discussion between a lawyer and his client about the plaintiff's claims and possible defenses.  In the Matter of Allison E. Mendel, 897 P.2d 68, 73 (Alaska 1995).

The number and quality of the contacts between the supporter of a privilege and the forum state   is analogous to an evaluation of personal jurisdiction, and the rationale is similar, You should expect the local law to apply if you have significant contacts with the forum.  Although this makes sense with respect to communications that take place in the forum state, it does not make sense with respect to communications that occurred in a foreign jurisdiction.   The purpose of the privilege is obstructed in the corporate setting  because the parties preparing to communicate cannot do so freely since they are risking the loss of confidentiality which is the purpose of the privilege in  the first place.

Materiality is a throwaway factor, because it in essence says that the privilege can be recognized only if the protected communications are not important in the first place.  The type of privilege is in this case attorney client privilege and its existence has been a cornerstone of American Jurisprudence since the earliest days of the republic, so it is recognized in all of the states.  Fairness issues turn on the facts of each case and there is nothing inherently unfair to Manumitted in applying Washington law.

The bottom line is that the forum and the state with the most significant relationships to the attorney client relationship have equal interests, but not necessarily at the same time.  The problem with the Restatement position on this choice of law issue is that it jeopardizes the rationale for and the social benefits of the attorney client confidentiality at all times and with respect to attorney client communications involving

corporations because corporations that do business with multiple forums will always be unsure if their communications will be protected. Because of that some subjects and some facts and some legal theories may never be discussed. This is analogous to the "chilling effect" associated with vague limitations on first amendment free speech rights.

The United States Supreme Court addressed the importance of the attorney client privilege in <u>Swidler & Berlin v. United States</u>, 524 U.S. 399, 407 (1998), the case involving the suicide of Deputy White House Counsel Vincent Foster, where the court held that the attorney client privilege survives the death of the client, as follows:

> The attorney client privilege is one of the oldest recognized privileges for confidential communications. The privilege is intended to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.". The issue presented here is the scope of that privilege; more particularly, the extent to which the privilege survives the death of the client. Our interpretation of the privilege's scope is guided by "the principles of the common law . . . as interpreted by the courts . . . in the light of reason and experience." [Citations omitted.]

Id. at 403.

> Despite the scholarly criticism, we think there are weighty reasons that counsel in favor of posthumous application. Knowing that communications will remain confidential even after death encourages the client to communicate fully and frankly with counsel. While the fear of disclosure, and the consequent withholding of information from counsel, may be reduced if disclosure is limited to posthumous disclosure in a criminal context, it seems unreasonable to assume that it vanishes altogether. Clients may be concerned about

> reputation, civil liability, or possible harm to friends or family. Posthumous disclosure of such communications may be as feared as disclosure during the client's lifetime. [Citations omitted.]

Id. at 407

Given the importance of the privilege and the long standing existence as part of our jurisprudence, what makes the most sense is to follow the basic rules of choice of laws and hold that the privilege law of the state with the most significant relationships will apply.  Not only is this consistent with the purpose of the attorney client privilege, but it  is also supported by other statements in comment d to Section 139. and it is consistent with the Alaska Supreme Court's general position when it reviews issues of law, that being:

> The constitutionality of  AS 09.17.020(j) and the proper interpretation of  AS 09.60.080 are issues of law.  We review these issues de novo,  adopting the rule of law that is most persuasive in light of precedent, policy, and reason. [Emphasis added, footnotes deleted.]

See Anderson v. State ex rel. Central Bering Sea Fishermen's Ass'n, 78 P.3d 710, 713 (Alaska 2003) and Polar Supply Co., Inc. v. Steelmaster Industries, Inc., 2005 WL 3508656 at 2 (Alaska 2005).

The court engaged in an analysis of significant interests between Alaska and Washington in  Long v. Holland America Line Westours, Inc. and part of that analysis is useful with respect to the choice of privilege law to apply to communications that took place in the State of Washington.

The first issue is whether the trial court correctly applied Washington law, as specified by the contract's choice-of-law provision. …

…The superior court correctly concluded that Holland America had a substantial relationship with the state of Washington because it was headquartered there and that was the location from which the contract was issued. (FN7) Long does not dispute this.

[3] Therefore, under Restatement § 187(2)(b) we should apply Alaska law only if three conditions are met: (1) Alaska's law would apply under Restatement § 188 in the absence of an effective choice of law; (2) Alaska has a materially greater interest in the issue; and (3) the application of Washington law would offend a fundamental policy of Alaska. Here, all three conditions are met.

The first condition is that Alaska's law would apply in the absence of an effective choice of law. It would. Under Restatement § 188, and in the absence of an effective choice of law by the parties, we must apply the principles of Restatement § 6 to determine which state has the most significant relationship. (FN8) …

The place of performance has "so close a relationship to the transaction and the parties that it will often be the state of the applicable laws"; (FN10) in this case, the place of performance is Alaska. The place of negotiation has little impact where, as here, the parties conduct negotiations from separate states by mail and telephone. (FN11) Similarly, the place of contract has little impact on the events at hand. Subsection (e), however, carries greater weight than either subsection (a) or (b). Nonetheless, we feel that the parties' domicile, residence, place of incorporation, or place of business, as listed in subsection (e), deserves less consideration than the place of contract performance. (FN12) …

Alaska has an undeniably strong interest in establishing uniform filing deadlines. (FN15) Uniform deadlines promote predictability for plaintiffs, defendants, and other interested parties alike. (FN16) Equally strong is Alaska's interest in providing victims of negligence who sustain personal injuries within the state access to a legal system that affords them a fair opportunity to seek redress from the negligent party. (FN17) So too is Alaska's interest in promoting public safety by deterring future negligent conduct within the state. (FN18) In contrast, the State of Washington's only interest in the issue at hand is in protecting resident corporations' contract rights relating to torts that they commit in other states. While this interest is certainly not insubstantial, we find it decidedly weaker than Alaska's interests. We hold, then, that Alaska's interests are materially greater than Washington's. (FN19)

The choice of law in this case thus turns on whether the third condition of Restatement §187(2)(b) is met--whether enforcing Washington law would offend a fundamental policy of the State of Alaska. In our view, enforcing Washington law would offend the fundamental policies underlying the three Alaska interests that we have just identified as being materially greater than Washington's interest in the issue at hand--enforcing uniform standards for commencing litigation in Alaska's courts, ensuring Alaska personal injury victims reasonable access to the Alaska legal system, and promoting public safety.

…The place of performance has "so close a relationship to the transaction and the parties that it will often be the state of the applicable laws"; (FN10) in this case, the place of performance is Alaska. The place of negotiation has little impact where, as here, the parties conduct negotiations from separate states by mail and telephone. (FN11) Similarly, the place of contract has little impact on the events at hand. Subsection (e), however, carries greater weight than either subsection (a) or (b). Nonetheless, we feel that the parties' domicile, residence, place of incorporation, or place

of business, as listed in subsection (e), deserves less consideration than the place of contract performance. (FN12) [Emphasis added.]

The court also noted that comment f to Restatement § 187 emphasized the domicile of one of the parties to the transaction. Long, 26 P.3d at 432, fn7 (reasonable basis for a choice of law exists "where one of the parties is domiciled or has his principal place of business" in chosen state).

It is relatively easy to apply the foregoing methodology to the issue of choice of privilege law, given the similar interests of Alaska and Washington in having a stable and uniform set of privilege rules that the citizens of each can rely on for all of the reasons identified in Swidler & Berlin, supra.

Comment d to Restatement §139 suggests that the forum would be more likely to recognize and apply a foreign rule of privilege under the following circumstances, all of which apply in this case.

"So the forum will be more  inclined to give effect to a foreign privilege that is well established and recognized in many states … ."

"The forum will be more inclined to give effect to a privilege if it was probably relied upon by the parties." [Emphasis added.]

Both of these factors strongly support recognition of Washington law with respect to the scope of the attorney client privilege in this case.  Most, if not all of these communications took place in Washington and the participants would have relied upon

the confidentiality that is the essence of the attorney client privilege. See Dietz v. Doe, 935 P.2d 611, 615-616 (Wa. 1997).

### 5. Applicable Federal Law With Respect To FRCP 26 And Work Product Protection.

The work product doctrine is designed to balance conflicting needs of the adversary system. On one hand, the system benefits from an attorney's diligent preparation in representing a client, while on the other hand is society's general interest in revealing all material facts relevant to the resolution of a dispute. In re Subpoenas Duces Tecum, 738 F.2d 1367, 1371 (D.C. Cir. 1984).

The work product protection safeguards the fruits of trial preparation by an attorney or other representative of a party, from discovery attempts of an opponent. Id. The primary purpose of the work product doctrine is to assure that an attorney is not inhibited in the representation of a client by the fear that the attorney's files will be open to scrutiny upon demand of an opposing party. American Buildings Co. v. Kokomo Grain Company, Inc., 506 N.E.2d 56, 62 (Ind. App. 1987). The attorney as well as the client may assert work product protection. Tronitech, Inc. v. NCR Corp., 108 F.R.D. 655, 657 (S.D. Ind. 1985).

FRCP 26(b)(3) provides that a party may obtain discovery of documents prepared in anticipation of litigation only as follows:

> ... a party may obtain discovery of documents
> and tangible things otherwise discoverable under subdivision

(b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.  In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Therefore, in addition to protecting the work product of a party, FRCP 26(b)(3) also applies in full to the work product of representatives of a party, including attorneys, consultants and insurers.

a.      **Opinion Work Product Is Afforded Near Absolute Protection**

Rule 26(b)(3) recognizes the distinction between "ordinary" and "opinion" work product.  While so-called "ordinary" trial preparation materials are discoverable upon a showing of substantial need, "opinion" work product, reflecting the mental impressions, conclusions, opinions and legal theories of attorneys and other representatives of a party, receives special protection under Rule 26(b)(3).

Opinion work product such as legal strategies, intended lines of proof, evaluation of the strengths and weaknesses of a case, and inferences drawn from interviews of witnesses is granted nearly absolute protection from discovery because any factual content that such items may have is generally outweighed by the adversary

system's interest in maintaining the privacy of an attorney's or other representative's thought processes and in ensuring that each side relies on its own wit in preparing their respective cases. Sporck v. Peil, 759 F.2d 312, 316 (3rd cir. 1985), cert. den. 474 U.S. 903 (1985). Accord, Admiral Ins. v. U.S. Dist. Ct. for Dist. of Ariz., 881 F.2d 1486, 1494 (9th Cir. 1989) (the rule affords special protection for work product that reveals mental impressions and opinions; other work product materials may be ordered produced upon a showing of substantial need or inability to obtain the equivalent without undue hardship). See also UpJohn Company v. United States, 449 U.S. 383, 399-401, 101 S.Ct.677, 687-88 (1980)

Opinion work product will be disclosed, if at all, only under extraordinary circumstances, as when the activities of counsel are directly at issue. Tronitech Inc. v. NCR Corp., 108 F.R.D. 655, 656 (S.D. Ind. 1985)

Manumitted's attempt to obtain the results of Tesoro's litigation strategies, legal positions and litigation objectives calls for the disclosure of opinion work product. The opinions, impressions and conclusions which Manumitted seeks to discover are clearly protected under the holdings of UpJohn, supra, Smedley v. Travelers Insurance Company, 53 F.R.D. 591 (D.N.H. 1971) and Tronitech Inc. v. NCR Corp., 108 F.R.D. 655 (S.D. Ind. 1985).

In UpJohn, corporate counsel conducted an investigation on a world wide basis to determine if illegal payments were being made to foreign nationals. In the course

of the investigation, counsel interviewed company employees and prepared summaries of these interviews.  The court discussed at length the special protection accorded to the work product of attorneys that included mental impressions, and went on to hold that these interview memoranda could not be discovered with the limited showing tendered by the IRS.  The court observed that some courts have held that opinion work product cannot be discovered under any circumstances but did not resolve that issue in the UpJohn case. UpJohn, 101 S.Ct. at 687-88.

The court in Smedley v. Travelers Insurance Company held that expressions of opinion by the defendant contained in an inter-office memoranda regarding liability and the settlement value of a case that might arise following an automobile accident were inferentially prepared in anticipation of litigation and, thus, the memoranda were protected by the work product doctrine.  Smedley at 592.  The Smedley court also held that an attorney's opinion as to liability or settlement value of a case would not be admissible at trial, nor was it calculated to lead to admissible evidence. Thus, the material sought was not relevant and was outside the scope of discovery in FRCP 26(b)(1).

In Tronitech Inc. v. NCR Corp., NCR's accounting firm retained an attorney to prepare a legal opinion concerning the  financial implications of a law suit against NCR.  The accounting firm required the opinion, called an audit letter, in order to complete a financial audit of NCR.  The Tronitech court, citing Smedley, held that the

audit letter regarding the implications of a lawsuit was not legally relevant, and even if it were, it was protected from discovery under the work product exception. Tronitech, at 655-56.

It is apparent that any evaluations undertaken in the investigation of Manumitted's claims upon which this lawsuit is based, along with any assessment of damages and any assessment of potential claims and defenses constitute opinion work product. It is highly unlikely that Manumitted can show the extraordinary circumstances necessary, as stated in Tronitech Inc., 108 F.R.D. 655, to compel production of opinion work product.

b.    **The Investigation Was Undertaken In Anticipation Of Litigation.**

The work product doctrine protects from discovery documents and tangible things prepared by a party or its representative in anticipation of litigation, so-called ordinary work product. Admiral Ins. v. U.S. Dist. Court for Dist. of Ariz., 881 F.2d 1486, 1494 (9th Cir. 1989) citing FRCP 26(b)(3). Most jurisdictions follow the rule that the work product doctrine protects both tangible and intangible material prepared in anticipation of litigation by or for a party or by or for the party's representative. In re Grand Jury Subpoena dated November 8, 1979, 622 F.2d 933, 935 (6th cir. 1979):

> Work product consists of the tangible and intangible materials which reflects an attorneys' efforts at investigating and preparing a case, including one's pattern of investigation, assembling of information, determination of the relevant

facts, preparation of legal theories, planning of strategy, and recording of mental impressions.

Litigation need not be ongoing as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation.  United States v. El Paso, 682 F.2d 530, 542 (5th cir. 1982).  "Documents prepared before litigation is formally commenced are protected from discovery if, at the time the documents were prepared, there is a substantial possibility that litigation will occur and that commencement of litigation is imminent."  SEC v. World-Wide Coin Investments, 92 F.R.D. 65, 66 (N.D. Ga. 1981).  In SEC v. World-Wide Coin, a securities fraud action, an SEC employee prepared a staff memorandum that recommended an enforcement action. The court held that such a memorandum had clearly been made in anticipation of litigation and thus was protected from discovery under the work product rule.  Id. at 67.

c.   **Manumitted Will Not Be Able To Carry Its Burden Of Showing Substantial Need And Undue Hardship Pursuant To FRCP 26(B)(3)**

Even if parts of Tesoro's investigation of Manumitted's complaints, preparation of a litigation plan and execution  of that plan may constitute ordinary, rather than opinion work product, Manumitted cannot carry its burden of showing substantial need and undue hardship necessary to compel production.

Manumitted seeks to compel production of the results of an investigation and ensuing steps taken to prepare for offensive or defensive litigation. However, the burden is thus on Manumitted, as the party opposing work product protection, to establish

reasons why materials should be disclosed.  Work product may be discovered if the

person seeking production establishes that there are adequate reasons or some necessity

or justification.  Hickman v. Taylor, 329 U.S. 495, 572 (1947).  FRCP 26(b)(3) provides

that a party may obtain discovery of documents prepared in anticipation of litigation

> ... only upon a showing that the party seeking
> discovery has substantial need of the materials in the
> preparation of the party's case and that the party is unable
> without undue hardship to obtain the substantial equivalent of
> the materials by other means.

In Eoppolo v. National Railroad Passenger Corp., 108 F.R.D. 292, 295

(E.D. Pa. 1985), the plaintiff argued that requested documents were necessary because

the accident at issue in the case occurred "sometime ago" and that statements taken at the

time from employees of the defendant were more accurate and truthful than information

sought while litigation was underway.  The court chastised the plaintiff for its

unwillingness to conduct discovery using its own resources, stating

> plaintiff has offered no more than mere surmise and
> conjecture that the documents sought were necessary and that
> plaintiff would sustain undue hardship trying to reconstruct
> the information.

Id.  Accord, Admiral Ins. v. U.S. Dist. Court for Dist. of Ariz., 881 F.2d 1486, 1494 (9th

Cir. 1989).

Manumitted  simply has no basis for a blanket fishing expedition into the

theories, strategies and assessments resulting from Tesoro's investigation made in

anticipation of litigation.  The primary motivating purpose behind the investigation was to anticipate and prepare for litigation in the form of enforcement activities by Tesoro against Manumitted, as a refiner against a dealer in default, or in the defense of Manumitted's affirmative claims that were eventually the subject matter of this lawsuit. Tesoro was reasonable in anticipating litigation with Manumitted given Manumitted's prior history, which includes a 1991 Chapter 11 bankruptcy, adversary proceeding litigation therein, and a loan modification and extensive workout agreement in 1995 and 1999, respectively.  Tesoro engaged its in house legal department to investigate the company's options, hired counsel early on to conduct the investigation and prepare the analysis of potential claims based upon that investigation.  The work product doctrine prohibits Manumitted from engaging in discovery into that preparation.

Manumitted has engaged in discovery and is fully able to  conduct its own investigation which it  has presumably done prior to filing suit.  It is also free to interview non-parties in connection with the facts surrounding its claim.  There has not been a demonstrated need by Manumitted for disclosure of the results and supporting materials compiled in Tesoro's investigation  and ensuing litigation planning.

Lastly, Manumitted is precluded from discovery with respect to facts, as opposed to conclusions and mental impressions, without a showing of exceptional circumstances under FRCP 26(b)(4)(B).  Manumitted cannot discover facts known to Tesoro based on the lesser showing of "substantial need" or "undue hardship" necessary

to set aside the work product protection under FRCP 26(b)(3).  See Roberts supra at 427-428.  Manumitted can obtain facts for its case from witnesses without any more difficulty than continuing with its investigation and taking depositions.

## ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGES APPLIED TO THE TESORO DOCUMENTS

1.    Amended Privilege Log.    Tesoro disagrees with Manumitted's assertion that the Privilege Log it has provided is inadequate to determine the validity of the asserted privilege[4] for which an *in camera* review is merited.  The language of Civil Rule 26(b)(5) is rather flexible and provides that a privilege log describe the nature of the communications "in a manner that without revealing the information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection."  Tesoro has provided the dates of the communications, among whom communications occurred and that they involve communications with counsel.  However, in order to provide potentially helpful information for the court and the parties in that regard, Tesoro has prepared and submits as Exhibit H a detailed Amended Privilege Log, thus obviating Manumitted's objections in that regard.  Tesoro is, of course, prepared to provide all of the subject documents to the court for *in camera* review.

2.    The withheld communications are between control group members and subject to the attorney client and work product privileges.

---

[4] Tesoro notes that it has also asserted the work product privilege with respect to documents withheld or redacted, a point not substantively addressed by Manumitted.

(a)    <u>Withheld communications are among control group members</u>.

The bulk of items withheld on grounds of attorney-client and work product privileges involve email communications among Tesoro managers and executives and members of Tesoro's in-house counsel staff.  Most of the emails involved Tesoro in-house counsel Scott Rammell whose office is in Auburn, Washington.  Also serving as Tesoro in-house counsel in Auburn is Mr. Charles Magee.  Tesoro's former in-house counsel, now retired, is Mr. Ronald E. Noel.  A list of the names and titles of the pertinent executive and in-house counsel involved in the Manumitted matter are attached as Exhibit A to the Affidavit of Donald Reese submitted herewith.

As is set forth in the Amended Privilege Log, most of the email traffic occurred between and among Mr. Rammell and Don Groscost, Vice President Light Products, Donald Reese, General Manager – Marketing Services, Jeff Evans, Area Marketing Manager of Light Products, and Calvin Leavell, Credit Director.  A number of emails, particularly in the environmental area, involved Mr. Rob Donovan, Vice President, Environmental Division.  Mr. Magee, Mr. Rammell, Mr. Groscost, Mr. Reese, Mr. Donovan, Mr. Evans, Mr. Leavell and others are without question members of Tesoro's control group for purposes of the attorney-client privilege in Alaska and elsewhere.  They have the authority, and in fact do, engage in-house and outside counsel on behalf of Tesoro.  <u>See</u> Affidavit of Donald Reese.  Communications with in-house counsel with regard to the Manumitted matter are treated as confidential.  <u>See</u> Affidavit

of Donald Reese.   Some of the individuals noted in the email traffic do provide information to control group members at the control group member's request.   Notably they include Rick Weyen, the Vice President, Strategic Planning, Merri Pennington, the Market Data Coordinator who deals with accounting matters, Terry Kruger, the former Marketing Development officer, who dealt with real estate matters, and Cindy Hughes, General Manager, Retail Services, who deals with the management of construction, engineering and maintenance services for Tesoro.   Even if Alaska privilege law applies, activities by non-control group members consisting of acquiring information and/or documents at the request and under the supervision of control group members are privileged.   Mr. Gilbert Buitron was involved in communications relative to Manumitted's credit default in conjunction with Mr. Leavell, the Credit Director, as was Mr. Castenada, Senior Credit Representative, who also works under Mr. Leavell's supervision.   Ms. Anastasia Duarte-Wilkinson, Retail Environmental Administrator worked on issues pertaining to the environmental status and concerns with regard to the Manumitted property with Mr. Donovan.   Mr. Greg Henderson, former manager of the Nikiski refinery and Mr. Terry Houtchens, Manager, Light Product Supply, were involved in communications relative to product commingling by Manumitted. Other individuals set forth on Exhibit A to Mr. Reese's affidavit include former legal assistants Aimee Souza and Matthew Waters who worked for the legal department.   Those

individuals obviously were involved in assisting the in house counsel in advising the corporation and they were also included in the creation of work product.

        (b)    The subjects of withheld communications are within the attorney-client and work product privileges.    Manumitted complains that all communications between officers, managers and employees of a corporation cannot be shielded just by including legal counsel.  It is necessary to examine the circumstances in each case under which legal counsel was including in communications.  In this matter, as set forth in the Amended Privilege Log, Mr. Rammell was involved in communications relating to Manumitted's breach of its obligations to Tesoro, how to investigate and respond to such breaches, communications with outside counsel and counsel for Manumitted, and in responding to and formulating settlement proposals and counter proposals.   Mr. Rammell was also involved in the environmental analysis of the Manumitted station.  All of these activities involve attorney client communications, but also obviously come within the work product doctrine as the communications arose in the face of known litigation in the form of Manumitted's breach of the Dealer Agreement by selling non-Tesoro product, the nonjudicial foreclosure, the pending Chapter 11 bankruptcy, and this lawsuit itself.

        Tesoro submits that the materials it has withheld or redacted are properly within the attorney-client and work product privileges in that they arise between or within control group members or involve proper supportive information to control

group members.  Further the vast bulk of the information specifically involves litigation strategy relative to Manumitted.  These materials also qualify as work product and the creation of work product is not dependent upon the status of the participants as control group members.

More particularly, the following documents come within the attorney client and work product privileges for the reasons stated below:

## COMMUNICATIONS TO AND FROM OUTSIDE COUNSEL

The following documents contain attorney notes or transmittal comments from outside counsel Frederick Odsen or involve communications to or from Tesoro to outside counsel:  100011, 100923, 101112, 101135, 101586, 101815, 102633, 100458, 101271-101274, 101628-101629, 102679-102681, 102692-102693 (internal e-mails from in house counsel re: information from outside counsel as to abandoned underground storage tank regulations), 102694 (internal e-mails from in house counsel re: information from outside counsel coming from Manumitted), 102698-102700 (communications with in house and outside counsel re: Petroleum Marketing Practices Act default notice), 102701-102702 (same as immediately preceding),102703-102704 (same as immediately preceding), 102723-102738, 103153 (communications between Holmes Weddle as outside counsel to in house counsel Mr. Rammell re: Petro Star's tortious interference with Manumitted Dealer Agreement), 102777 (communications with in house counsel re: same) 103052, 103056,103059, 103062, 103068, 103069, 103078-103081 (information

from outside counsel re: PMPA (Petroleum Marketing Practices Act) issues to Mr. Rammell and internal e-mails re: same), and 103082-103085 (same information with input from Mr. Groscost and Mr. Leavell).

Communication with outside counsel is clearly privileged. Also, counsel for Tesoro and counsel for Manumitted agreed that such communications with outside counsel (either for Tesoro or Manumitted) was privileged, but did not have to be the subject of a privilege log unless requested by counsel for either side upon thirty (30) days notice, see letter dated January 6, 2006, attached as Exhibit G. Tesoro has nevertheless provided the above referenced privilege log information which involved either incidental information (transmittals and the like) or e-mails in which communications include information derived from outside counsel. All of that data is subject to the attorney client privilege as well as the work product privilege. It is also information and communications undertaken either in the context of litigation or in anticipation thereof.

### TESORO INTERNAL E-MAILS WITH IN HOUSE COUNSEL PERTAINING TO CLAIMS BY AND BETWEEN TESORO AND MANUMITTED ARE PRIVILEGED

The vast bulk of the e-mails in the privilege log involving in house counsel involve locating data and documents, analyzing them, and litigation strategy. Manumitted went into default under its Dealer Agreement by purchasing and reselling non-Tesoro product in the fall of 2003. Many of the e-mails arose after that time. As such they are privileged based upon the attorney client and work product privileges.

Those communications include 102721 (consideration of actions and remedies based on Dealer Agreement or note default), 102746 (same issues and concerns re: Manumitted's listing on an ADEC (Alaska Department of Environmental Conservation) do not deliver list), 102748 (same issues and seeking transaction documents), 102759 (scheduling meeting to address Dealer Agreement defaults), 103074 and 103076 (5/20/04 e-mail forwarding and clarifying comments from Mr. Olds re: prospective lessee), 102669 (communications from in house paralegal Ms. Michelle Straus re: Proof of Claim preparation in Manumitted bankruptcy), 102672 (same issues addressed with in house counsel Mr. Rammell), 102673, 102674 (communications with in house counsel re: product prices and sales to Manumitted), 102676 (communications with in house counsel re: pricing to Service Oil and Gas, Inc.--information not requested in Manumitted's discovery requests), 102678 (communications re: postponement of foreclosure), 102682-102688, 102689, (gathering information relative to property pertinent to Manumitted settlement offer and any response--information neither discoverable nor admissible based on settlement negotiations as well), 102695, 102708 (meeting scheduling or teleconferences to discuss status and possible responses to Manumitted), 102709, 102701 (communications with in house counsel re: note default and remedies for default including possible property purchase by Tesoro or third party), 102769 (communication with in house counsel in late October, 2003 re: Manumitted's commingling of products), 103053, 103063-103065 (communications with in house

counsel re: costs and related issues associated with possible settlement offer to Manumitted), 103063-103065, 103066-103067 (communications from in house counsel re: additional settlement offer from Manumitted, environmental status and indemnity agreement), 103073, 103089-103090, 103092 (communications with in house counsel forwarding and clarifying comments from Mr. Olds re: prospective lessee; Tesoro remedies relative to Manumitted's breaches of agreements), 103158 (communication with in house counsel re: November, 2003 letter to Manumitted re: breach of Dealer Agreement and to Petro Star re: tortious interference), 103171,103172,103176, 103177 (communications to in house counsel re: setting up a teleconference to address responses in light of Manumitted product commingling) and 103179 (possible approaches or responses to evidence of Manumitted product commingling).

Communications are also privileged as work product insofar as they pertain to locating operative documents for purposes of pursuing claims against Manumitted, the current bankruptcy, this lawsuit and anticipated litigation pertinent key transactional documents (particularly from the 1999 restructuring). Communications within the purview of that privilege include 102748, 103133, 103142,102675, 102677,102690, 102696, 102757, 103131-103138, 103175.