# SETTLEMENT AND
# CONVEYANCE AGREEMENT

The parties to this Settlement and Conveyance Agreement ("Agreement") are **Tesoro Alaska Company**, formerly known as Tesoro Alaska Petroleum Company of 3230 C Street, Anchorage, Alaska 99503 ("Lender"), **Harbor Fuel Co., Inc., also known as Harbor Fuel Company, Inc., also doing business as Wolverine Gas and Oil,** an Alaska corporation of P.O. Box 336, Valdez, Alaska 99686 ("Borrower"), and **Benjamin H. Olds**, of P.O. Box 336, Valdez Alaska 99686 ("Guarantor").

RECITALS. The parties stipulate as to the correctness of the following:

A.    Borrower is a reorganized Chapter 11 Debtor pursuant a certain Plan of Reorganization dated March 25, 1992 ("Plan") in a proceeding captioned In re: Harbor Fuel Co., Inc. a/k/a Wolverine Gas and Oil, Case No. A-91-00815 HAR (Chapter 11). The Plan was confirmed by the Bankruptcy Court on May 7, 1992. The Plan together with a certain Memorandum Agreement Regarding Settlement of Litigation and Debt attached to the Plan as Exhibit "C" ("Memorandum Agreement") provided for the treatment of the obligations owed by Borrower and Guarantor to Tesoro. In conjunction with the Plan and Memorandum Agreement the parties entered into the following documents:

(1)    Promissory Note dated as of April 1, 1992 in the stated amount of $1,000,000, ("$1,000,000 Promissory Note");

(2)    Promissory Note dated as of April 1, 1992 in the stated amount of $600,000 ("$600,000 Promissory Note");

(3)    Security Agreement dated May 7, 1992, ("Security Agreement");

(4)    Modification of Deed of Trust dated May 7, 1992 pertaining to a certain Deed of Trust dated July 25, 1991 and recorded on August 9, 1991 in Book 113 at Page 934 of the Books and Records of the Valdez Recording District, Third Judicial District, State of Alaska covering the following described real property: Lot 17, Block 5, ROBE RIVER SUBDIVISION NO. 1, according to the official plat thereof, filed under Plat Number 84-2, Records of the Valdez Recording District, Third Judicial District, State of Alaska, ("Robe River Subdivision Deed of Trust");

PAGE 10 27 EXHIBIT A

Exhibit *A*
Page 1 of 2l 

(5)   Modification of Deed of Trust dated May 7, 1992 pertaining to a certain Deed of Trust dated July 25, 1991 and recorded on August 8, 1991 in Book 34 at Page 492 of the Books and Records of the Chitina Recording District, Third Judicial District, State of Alaska covering the following described real property:

PARCEL NO. 1:

A Tract of land situate in US SURVEY NO. 3343A in surveyed Section 22, Township 11 North, Range 8 East, Copper River Meridian, Alaska, in the Chitina Recording District, Third Judicial District, State of Alaska and being more particularly described as follows:

Commencing at corner no. 2 of US SURVEY NO. 3343, a BLM brass capped monument and a common corner with Northwest corner USS 3343A; thence N69°19'33"E along the Northerly line of USS 3343A, the Tok Cutoff Highway right of way, a distance of 194.84 feet to a corner marked with a 5/8" x 30" rebar, the true point of beginning; thence S20°39'35"E a distance of 150.00 feet to an unmarked corner at the Tok Cutoff highway right of way centerline; thence N69°19'33"E along said centerline a distance of 325.48 feet to an unmarked corner; thence N20°39'35"W a distance of 150.00 feet to a corner on the northerly line of said survey, the highway right of way marked by a 5/8 x 30" rebar; thence S69°19'33"W along the northerly line of said survey a distance of 325.48 feet to a corner, the True Point of Beginning.

PARCEL NO. 2:

A tract of land situate in US SURVEY NO. 3343 in surveyed Section 22, Township 11 North, Range 8 East, Copper River Meridian, Alaska, in the Chitina Recording District, Third Judicial District, State of Alaska and being more particularly described as follows:

Commencing at corner No. 2 of US SURVEY NO. 3343, a BLM brass capped monument; thence N69°19'33"W along the southerly line of said survey a distance of 194.84 feet to a corner marked with 5/8" x 30" rebar, the True Point of

PAGE 2 of 27 EXHIBIT A

Exhibit A
Page 2 of 26

Beginning; thence N20°41'35"W a distance of 224.06 feet to a corner marked with a 5/8" x 30" rebar; thence N69°19'33"E a distance of 325.48 feet to a corner marked by a 5/8" x 30" rebar; thence S20°41'35"E a distance of 224.06 feet to a corner marked with a 5/8 x 30" rebar; thence S69°19'33"W a distance of 325.48 feet to a corner, the True Point of Beginning ("Slana Property").

(6)    Modification of Deed of Trust dated May 7, 1992 pertaining to a certain Deed of Trust dated July 25, 1991 and recorded on August 8, 1991 in Book 34 at Page 483 of the Books and Records of the Chitina Recording District, Third Judicial District, State of Alaska covering the following described real property: Lots 5 and 33 of Section 19, Township Four North, Range 1 West, Copper River Meridian, Alaska, containing 7.57 acres, more or less, according to the United States Government Survey thereof ("Wolverine Gas and Oil Property");

(7)    Guaranty Agreement dated May 7, 1992 ("Guaranty") and

(8)    Mutual Release executed by Borrower, Guarantor and Tesoro on May 7, 1992;

B.    Effective November 1, 1995 the parties entered into a certain Loan Modification Agreement ("Loan Modification Agreement"). In conjunction with the Loan Modification Agreement, the parties entered into certain additional loan documentation including but not limited to the following:

(1)    Amended and Restated Promissory Note in the stated amount of $1,157,544.65 ("Amended and Restated Promissory Note");

(2)    Letter Agreement stipulating to the stated amount of the Amended and Restated Promissory Note;

(3)    Second Modification of Deed of Trust recorded May 6, 1996 in Book 45 at Page 918 of the Books and Records of the Chitina Recording District, Third Judicial District, State of Alaska;

(4)    Second Modification of Deed of Trust recorded February 23, 1996 in Book 45 at Page 552 of the Books and Records of the Chitina Recording District, Third Judicial District, State of Alaska;



PAGE 3 of 27 EXHIBIT A

Exhibit A
Page 3 of 26

(5) Deed of Trust executed by Borrower as Trustor, with Lender as Beneficiary, with First American Title Company of Alaska as Trustee, recorded on February 22, 1996 in Book 128 at Page 401 of the Books and Records of the Valdez Recording District, third Judicial District, State of Alaska, and covering the following described real property:

> Lot 2A, Block 32A, of the Replat of Blocks 32 and 39,
> SOUTH PORTION OF MINERAL CREEK SUBDIVISION,
> according to the official plat thereof, filed under Plat Number
> 74-2, Records of the Valdez Recording District, Third Judicial
> District, State of Alaska ("Old Station Property");

(all of the loan documents hereinabove set forth these Recitals being hereinafter referred to as "Loan Documents");

(6) Payment and performance of the following agreements is secured by the Loan Documents: a) the Amended and Restated Promissory Note, b) that certain Tesoro Alaska Petroleum Company Distributor Agreement dated February 26, 1986 between Lender and Borrower, and c) that certain Tesoro Alaska Petroleum Company Unleaded Gasoline Compliance Agreement (Distributor) dated February 26, 1986 between Lender and Borrower (collectively the "Distributor Agreement");

(7) The amount due and payable by Borrower to Lender as of April 22, 1999 under the Amended and Restated Promissory Note is the sum of $570,914.92 (the "Note Indebtedness");

(8) The amount due and payable by Borrower to Lender as of April 22, 1999 for product sold under the terms of the Distributor Agreement is the sum of $1,580,888.63 (the "Distributor Agreement Indebtedness");

(9) Lender has a first priority Deed of Trust lien upon (a) the Slana Property, (b) the Wolverine Gas and Oil Property, and (c) the Old Station Property in order to secure the Note Indebtedness and the Distributor Agreement Indebtedness;

(10) As further security for the Note Indebtedness and the Distribution Agreement Indebtedness, Lender has a first priority security interest in all of the Borrower's tangible and intangible personal property (except for (i) a certain propane tank and delivery system ("Propane Tank") upon which there exists a first priority security interest held by Mr. Lenhart J. Grothe to secure an obligation of approximately $ 225,000.00 (the "Grothe Indebtedness")) and (ii) a personal property lease or security interest held by Associates Commercial Corp. covering a certain 1996 Beall Truck Tank,

SIN T27488, mounted upon one (1) 1996 Ford truck, VIN 1FDYH85EXTVA12898 ("Lease Beall Tank Truck") to secure an obligation of approximately $ 67,000.00 _____ (the "Beall Indebtedness");

(11) Borrower formerly owned a fee simple interest in the following described real property:

> Tract V, PORT VALDEZ SUBDIVISION, according to the official plat thereof, filed under Plat Number 77-1, Records of the Valdez Recording District, Third Judicial District, State of Alaska ("Tract V");

(12) Borrower's title to Tract V was subject to a certain Deed of Trust dated February 22, 1983, executed by Robert E. Hukka and Thore Erikkson as trustors, with Alaska Title Guaranty Agency, Inc. as Trustee, with James R. Vculek as Beneficiary, recorded on March 14, 1983 in Book 98 at Page 97, the beneficial interest of which was assigned to Lenhart Grothe via an instrument recorded on April 18, 1989 in Book 109 at Page 390; and to a certain Deed of Trust dated March 15, 1993, executed by Valdez Investment Corporation as trustor, with Land Title Company of Alaska, Inc. as Trustee, with Lenhart Grothe as Beneficiary, recorded on March 24, 1993 in Book 119 at Page 403, of the Books and Records of the Valdez Recording District, Third Judicial District, State of Alaska. Borrower has conveyed Tract V to Lenhart Grothe.

(13) Borrower holds a lessee's interest in a certain Lease by and between Borrower as lessee and the Alaska Railroad Corporation as lessor, dated September 26, 1989 and designated Contract No. 4797 and covering the real property set forth on Schedule 1 attached hereto and incorporated herein by reference (the "Alaska Railroad Lease");

(14) Borrower holds a lessee's interest in, and an option to purchase the following described real property by virtue of a certain Distributor Lease Agreement dated May 31, 1995 (the "Tesoro Gas Station Lease") by and between Borrower as lessee and Lender as lessor and covering the following described real property: Lot 1A, Block 33, Mineral Creek Subdivision, South Portion, according to Plat 93-10, Valdez Recording District, Third Judicial District, State of Alaska (the "New Station Property");

(15) Borrower is in the process of acquiring fee simple title to the following described parcel of real estate, and shall acquire it prior to Closing:

> Lot 1-A, Block 32A, of the Replat of Blocks 32 and 39, South Portion of Mineral Creek Subdivision and Harbor

Subdivision, according to Plat 74-2, in the Valdez Recording District, Third Judicial District, State of Alaska ("Benny James Property");

(16) The Amended and Restated Promissory Note is currently in default;

(17) The Distributor Agreement is currently in default;

(18) The parties desire to resolve all claims they have or may have against one another with respect to the Note Indebtedness and the Distributor Agreement Indebtedness. Borrower shall convey certain assets including the bulk of the collateral securing the Note Indebtedness and the Distributor Agreement Indebtedness to Lender or any nominee of Lender; Lender shall release Borrower from liability under the Loan Documents and pay other consideration upon the terms and conditions set forth herein.

IN CONSIDERATION OF THE FOREGOING and the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

1.    <u>Conveyance of Property to Lender</u>.  Borrower agrees to convey to Lender or any nominee of Lender ("Lender's Nominee") absolutely and free of any right of redemption or other right or interest of Borrower or anyone claiming through or under Borrower, the following real and personal property (all of which shall be referred to collectively in this Agreement as the "Collateral"):

(a)    Title in and to the following real property:  (1) the Wolverine Gas and Oil Property, (2) the Old Station Property, and (3) the Benny James Property (collectively hereinafter sometimes also referred to as the "Real Property"); but specifically <u>excluding</u> the Slana Property, which will be released from the Deed of Trust held by Lender covering it at Closing;

(b)    Title free and clear of any liens, security interests or encumbrances in and to all personal property owned by Borrower and located on the Real Property, all personal property acquired for installation or use in connection with the Real Property, all Borrower's rights under contracts or other arrangements to acquire personal property for installation on or use in connection with the Real Property, and all of Borrower's tangible personal property used in connection with its wholesale fuel business and its retail heating oil business including but not limited to all of the collateral (including but not limited to certain titled vehicles) set forth on Exhibit "A-1" attached hereto and incorporated herein by reference, but specifically <u>excluding</u> the personal property set forth on Exhibit "B-1" and incorporated herein by reference which will be retained by Borrower (the personal

*The transfers of the titles to the vehicles (and pertinent lien releases) will be completed within fourteen (14) days of the date of closing after Lender and Borrower complete a study and reconciliation of the status of those titles

property being conveyed to Lender or Lender's Nominee is hereinafter referred to as "Personal Property");

(c)    Title free and clear of any liens, security interests or encumbrances in and to all intangible property used in connection with or otherwise related to the Real Property and the Personal Property used in connection with or otherwise related to Borrower's wholesale fuel business or its retail heating oil business including but not limited to contract rights (including but not limited to construction contracts, leases and rental agreements), accounts, accounts receivable, rights to payment, claims, causes of action, (including but not limited to the proceeds of all claims and causes of action of Borrower against Balance, Inc. an Alaska corporation, and Sound Development, Inc., an Alaska corporation), agreements, commitments, booklets and manuals, advertising material, guaranties, warranties, telephone numbers, telefax numbers, and mail addresses, surveys, plans and specifications, architectural drawings, sales contracts, rental documents, customer lists (excluding the list for the LP-gas business and Valdez Tesoro Service Station), business names including the corporate, business and d/b/a names "Harbor Fuel Company" "Harbor Fuel Co., Inc." "Harbor Fuel Company, Inc." and "Wolverine Gas and Oil," assignable licenses and governmental permits and permission relating to the Real Property or the Personal Property, including but not limited to all of the intangible property listed on Exhibit A-2, except the intangible property listed on Exhibit B-2 (all of the foregoing collective referred to hereinafter as the "Intangible Property").

(i)    Borrower agrees to reasonably cooperate with Lender, at no charge, and to assist in the collection of all accounts and accounts receivable, and in the prosecution by Lender, at Lender's expense, of claims and causes of action assigned to Lender by Borrower hereunder.

(ii)    In the case of the claims and causes of action against Balance, Inc. and Sound Development, Inc., Borrower agrees to diligently pursue all such claims and causes of action at its expense, to defend at its expense all counterclaims asserted against Borrower in that certain litigation captioned Harbor Fuel Co., Inc. v. Balance, Inc. and Sound Development, Inc., Civil Action No. 3AN-99-04359 Civil, and to remit all proceeds of the claim or litigation to Lender or Lender's Nominee. Borrower agrees not to settle any such claim or cause of action without Lender's prior written consent, which will not unreasonably be withheld.

(d)    Suburban Propane Agreement. That certain Agreement dated March 24, 1988 by and between Suburban Propane Division of Quantum Chemical Corporation and Borrower shall be terminated effective upon the Closing of the sale of Borrower's propane business to Service Oil & Gas, Inc. ("Service") in accordance with a



certain Agreement dated ___April 23, 1999___ by and between Borrower and Service (the "Propane Business Sales Agreement") for the cash sales price of Four Hundred Ninety Five Thousand and No/100 Dollars ($495,000.00). All proceeds of the Propane Business Sales Agreement remaining after the payment of (a) reasonable closing costs as therein provided, and (b) the payment of $148,000 of such cash proceeds to Lenhart Grothe as provided in Paragraph 7 ("Net Cash Proceeds") shall be paid to Lender at Closing.

(e)    <u>Alaska Railroad Lease</u>. Borrower shall assign the Alaska Railroad Lease to Lender free and clear of encumbrances to Lender's Nominee if so requested by Lender's Nominee in writing. Provided the Alaska Railroad consents, on or before May 15, 1999, Borrower shall, in accordance with all applicable laws and regulations, remove all of the petroleum product storage tanks currently stored above ground on the Alaska Railroad lease premises and dispose of them. Borrower shall immediately upon Closing grant Lender and Lender's Nominee access to the premises covered by the Railroad Lease to permit Lender or Lender's nominee to inspect such premises and to remove or otherwise take possession and control of all of the Collateral located thereon.

(e)    <u>Card Lock Agreement</u>. All of Borrower's right, title and interest in and to an informal, oral Cardlock Agreement by and between Borrower and Alaskan House, Inc. pertaining to a certain petroleum product distribution facility located at Mile 81 of the Richardson Highway ("Mile 81 Card Lock Agreement") shall be conveyed at Closing to Lender or Lender's Nominee.

(g)    <u>Miscellaneous Leases</u>. All of Borrower's right, title and interest in and to the following leases of personal property shall be conveyed at Closing to Lender's Nominee who shall assume all obligations thereunder:

(i)    That certain lease between Borrower and <u>Xerox Corp.</u> dated ___May, 1996___ covering a Xerox copy machine, ~~more particularly described as~~

(ii)    That certain lease pertaining to the Beall Indebtedness.

2.    <u>Conveyances</u>.

(a)    All of the Real Property shall be conveyed by a Bargain and Sale Deed (the "Deed") to Lender or Lender's Nominee, in recordable form acceptable to Lender, and a condition precedent to Lender's duty to close shall be the receipt by it of a preliminary commitment for title insurance insuring such Deed shall transfer good and marketable title to the Real Property in fee simple, free and clear of all liens and encumbrances, subject only to (a) the rights and reservations expressed in the applicable

U. S. Patent or State of Alaska Patent to the Real Property, (b) the lien of current real estate taxes not yet due and payable, and (c) usual and ordinary public utility easements for gas, electric, water, sewer and other utility lines.

(b)    Borrower shall convey the Personal Property and the Intangible Property to Lender or Lender's Nominee at Closing by executing and delivering to Lender at Closing a warranty bill of sale (the "Bill of Sale"), in a form acceptable to Lender, duly executed and acknowledged by Borrower, conveying the Personal Property and the Intangible Property to Lender or Lender's Nominee free and clear of all liens and encumbrances.

3.    Absolute Conveyance.  Borrower acknowledges and agrees that the conveyance of the Collateral to Lender or Lender's Nominee according to the terms of this Agreement is an absolute conveyance of all of Borrower's right, title and interest in and to the Collateral in fact as well as form and was not and is not now intended as a mortgage, trust conveyance, deed of trust or security instrument of any kind, that the consideration for such conveyance is exactly as recited herein, and that Borrower has no further interest (including rights of redemption or similar rights) or claims in or to the Collateral or to any proceeds or profits that may be derived there from of any kind whatsoever.  Borrower and Guarantor acknowledge that Lender intends that immediately upon or coincident with Closing, the Real Property, Personal Property and Intangible Property (or some leasehold or other interest therein) may be conveyed free and clear of any interest of Borrower or Guarantor to Lender's Nominee.

4.    Covenant Not to Sue.

(a)    Subject to the terms of this Agreement, Lender agrees at Closing to accept the absolute conveyances, provided for herein, and covenants that it will not seek to procure any deficiency judgment against Borrower or Guarantor or sue Borrower or Guarantor on the Note Indebtedness or the Distributor Agreement Indebtedness.

(b)    Notwithstanding anything arguably to the contrary contained in this Agreement or any other document executed in connection herewith, Lender reserves the right to foreclose upon the Collateral for a period of one (1) year from Closing (by filing a foreclosure action or recording a notice of default and sale within such a one (1) year period) in Lender's sole and absolute discretion for any reason in its sole and absolute discretion, including but not limited to, for the purpose of extinguishing any junior or subordinate lien upon any of the Collateral.  Lender agrees at Closing to place the following endorsement upon the Amended and Restated Promissory Note: "The Maker's obligations under this Amended and Restated Promissory Note are subject to the terms, covenants and conditions of that certain Settlement and Conveyance Agreement dated

Settlement and Conveyance Agreement        -9-

PAGE 90/27 EXHIBIT A

Exhibit A
Page 9 of 26

April 23, 1999  by and between Tesoro Alaska Company, Harbor Fuel Co., Inc. and Benjamin H. Olds." Nothing contained in this paragraph shall be construed to modify, alter or abridge any of Lender's rights and remedies under this Agreement or under any of the Agreements executed in conjunction with this Agreement, except the rights extinguished in subparagraph 4(a) above.

(c)    At Closing, the Guaranty shall be marked "satisfied" by Lender and delivered to Guarantor.

5.    <u>Obligations to Third Parties/Obligations Assumed By Lender.</u>

(a)    Borrower acknowledges and agrees that the acceptance by Lender or Lender's Nominee of title to the Collateral pursuant to the terms of this Agreement and any assignment to Lender or Lender's Nominee of various contracts and agreements pertaining to the Collateral shall not create any obligations on the part of Lender or Lender's Nominee to third parties that have claims of any kind whatsoever against Borrower with respect to the Collateral and that neither Lender nor Lender's Nominee assumes or agrees to discharge any liabilities pertaining to the Collateral that have occurred or shall occur prior to Closing except as follows: Lender agrees to assume and to timely pay all of the obligations ("the Assumed Liabilities") set forth on Exhibit "C" attached hereto and incorporated herein by reference, as and when such obligations become due, and to defend, indemnify and hold Borrower harmless of any from any liability, loss, damage, or obligation of any type or nature (including costs and attorney's fees) with respect thereof.  Borrower stipulates, warrants and represents that the list set forth on Exhibit "C" is a complete listing of all liabilities being assumed by Lender and that the amounts set forth on Exhibit "C" are true and correct.  Borrower and Guarantor jointly and severally agree (except with reference to the Assumed Liabilities (and as to Guarantor, except as provided in Paragraph 5(b)) to indemnify, defend and hold Lender and Lender's Nominee free and harmless of and from any liability, loss, damage or obligation of any type or nature (including costs and attorney's fees) pertaining to all claims and liabilities relating to the Collateral, resulting from events that have occurred or failed to occur or shall occur or fail to occur prior to the Closing.   Subject to the provisions of Paragraph 21 pertaining to assignment of this Agreement, no person not a party to this Agreement shall have any rights, as a third-party beneficiary or otherwise, as a result of this Agreement, except the account payees of the obligations listed on   "C".

(b)    The indemnification obligations set forth in Paragraph 5(a) will as to Guarantor not extend to the environmental condition of (a) the Wolverine Gas and Oil Property, (b) the Old Station Property or (c) the Benny James Property (collectively the "transferred properties").  The indemnification obligations set forth in Paragraph 5(a) will as to Borrower extend to the environmental condition of the transferred properties,

PAGE 00 27 EXHIBIT  A

Attachment to Page 10
Settlement Conveyance Agreement

in an aggregate amount not exceeding Two Hundred Eleven Thousand and No/100 Dollars ($211,000.00) with a list to be provided on or before April 26, 1999.

PAGE 10 of 27 EXHIBIT A

subject however to the terms and conditions of Paragraphs 11(g) and 12(b) of that certain Asset Purchase Agreement dated _April 23, 1999_    by and between Lender and Service Oil & Gas, Inc. and the terms of that certain Indemnity Escrow Agreement dated _April 23, 1999_    by and between Lender, Service Oil & Gas, Inc. and First American Title of Alaska ("Indemnity Escrow Agreement"). The referenced paragraphs in the Asset Purchase Agreement and the Indemnity Escrow Agreement create a $95,000.00 escrow of funds with which to address certain environmental assessments and remediation, terminating on September 30, 2000.

6.    <u>Retained Third Party Liabilities.</u>  Borrower warrants and represents that all of its payables, accruals and long term indebtedness (other than the Assumed Liabilities) are as set forth on Exhibit "D" ~~attached hereto and incorporated herein by reference~~ ("Retained Third Party Liabilities"). Borrower shall following Closing retain and continue to be liable for all Retained Third Party Liabilities, shall pay the same as and when they become due, and Borrower and Guarantor agree to defend, indemnify and hold Lender and Lender's Nominee harmless of and from any liability, loss, damage, or obligation of any type or nature (including costs and attorneys fees) with respect thereto.

7.    <u>Payment of Grothe Obligation.</u>  At the closing of the Propane Business Sales Agreement, Lender agrees that $148,000 of the cash proceeds from the proceeds of the sale of the LP-Gas assets shall be paid to Lenhart Grothe, which Grothe has agreed to accept as full satisfaction of the Grothe Indebtedness. A condition to such agreement by Lender to provide payment to Mr. Grothe is that he release any security interest he claims in and to any assets of the Borrower (including but not limited to the Propane Tank) and that he certify in writing in a form acceptable to Lender that he does not assert any other lien, mortgage, security interest or encumbrance of any kind on any of the collateral, the Real Property, the Personal Property, the Intangible Property or any of the property covered by the Propane Business Sales Agreement.

8.    <u>Compensation for Borrower's Reduction of Distributor Agreement Indebtedness During Negotiation Period.</u>  Lender acknowledges that Borrower has reduced its obligation under the Distributor Agreement from the level that existed as of May 17, 1998. Lender agrees to compensate Borrower for this reduction by paying to Borrower a credit of $68,164.68 to purchase fuel under the Dealer Agreement to be executed at Closing. At Closing, Borrower states, warrants and represents that all branded dealers served by Borrower shall have received all appropriate credits for credit card purchasers by all customers of such dealers.

9.    <u>Cancellation of Distributor Agreement--Execution of Direct Dealership Agreement and Guaranty--Termination of Tesoro Gas Station Lease--Covenant Not to Compete.</u>  As a material part of the consideration for the conveyances herein provided

PAGE 12 of 27 EXHIBIT A

Exhibit A
Page 12 of 26

Attachment to Page 11
Settlement Conveyance Agreement

*

which were provided to Lender in draft form on or about April 19, 1999 and will be provided to Lender in final form on or before April 26, 1999.

**

The credit in the amount of $68,164.68 is subject to post-closing reconciliation within fourteen (14) days based upon a review by Lender and Borrower of the precise amount of the reduction in the obligation under the Distributor Agreement between May 17, 1998 and the date of closing.

PAGE 13 of 27 EXHIBIT A

Exhibit A
Page 13 of 26

and in order to facilitate the continued business relationship between the parties, the parties agree as follows:

(a)     At Closing the Distributor Agreement shall be deemed canceled and shall be of no further force and effect.

(b)     At Closing, Borrower and Lender shall execute a Dealer Agreement in the form attached hereto as Exhibit "E" and incorporated herein by reference ("Dealer Agreement").

(c)     At Closing, Guarantor and Lender shall execute a Guaranty in the form attached hereto as Exhibit "F" and incorporated herein by reference ("Valdez Tesoro Station Note and Dealer Agreement Guaranty").

(d)     At Closing, Borrower and Lender shall execute a Lease Termination Agreement with respect to the Tesoro Gas Station Lease in the form attached hereto as Exhibit "G" and incorporated herein by reference ("Lease Termination Agreement"). The Lease Termination Agreement shall provide that the Tesoro Gas Station Lease shall be terminated effective upon Closing and that in consideration of the conveyance of the New Station Property to Borrower, free and clear of liens and encumbrances, Borrower shall at Closing execute a Promissory Note in the form attached hereto as Exhibit "H" and incorporated herein by reference payable to Lender in the stated amount of $570,914.92 ("Valdez Tesoro Station Note") payable in monthly installments, including interest at the rate of eight percent (8%) per year from and after the date of Closing, in the amount of $5,500.00 commencing on June 1, 1999 and continuing on the first (1st) day of each subsequent month until May 1, 2009 at which time the entire remaining principal balance and any accrued but unpaid principal shall be due and payable in full. The Tesoro Valdez Station Note and the Dealer Agreement shall be secured by a first Deed of Trust covering the New Station Property and supported by associated loan documents including an Assignment of Rents and a Security Agreement in the form attached hereto as Exhibit I (collectively the "Valdez Tesoro Station Deed of Trust"). The Dealer Agreement shall also be secured by the accounts and accounts receivable of Debtor.

(e)     At Closing, Borrower and Guarantor will execute and deliver to Lender and Lender's Nominee a Covenant Not To Compete in the form attached hereto as Exhibit "J" and incorporated herein by reference ("Covenant Not To Compete").

(f)     At Closing, Lender and Borrower shall execute a Mutual Hazardous Materials Indemnity Agreement covering the Valdez Tesoro Station in the form attached hereto as Exhibit "K."

PAGE 14 of 27 EXHIBIT _A_

Exhibit A
Page 14 of 26

10.    Covenants of Borrower.

(a)    Borrower shall deliver to Lender or Lender's Nominee no later than one (1) day prior to the date of Closing:

(i)    True and correct copies of all the documents comprising the Intangible Property; and

(ii)    All keys in Borrower's possession pertaining to the Collateral. Borrower acknowledges that Borrower is intentionally, expressly and unconditionally abandoning the Collateral as of the date of Closing and that after said date Lender or Lender's Nominee is and shall be entitled to complete and exclusive possession and control of the Collateral. The parties shall cooperate in transferring possession of the properties.

(b)    Borrower shall allow Lender or Lender's Nominee, their agents, employees, consultants and contractors access to the Real Property between the execution of this Agreement and Closing to:

(i)    Inspect the Collateral at any time or times during Lender's normal business hours; and

(ii)    Inspect, audit and transcribe the books and records maintained by Borrower in connection with the construction and operation of the Collateral.

(c)    Between the date of this Agreement and Closing, Borrower shall not:

(i)    Enter into any contracts or agreements pertaining to the Collateral without first obtaining the written consent of Lender; or

(ii)    Convey or remove from the Real Property, or from any other location where now located, any of the Personal Property or the Intangible Property except in the normal course of operating its business and except as to the excluded property.

(d)    Both before and after Closing, Borrower shall cooperate with Lender and Lender's Nominee by providing Lender and Lender's Nominee with such information and documentation and by doing such acts as Lender or Lender's Nominee may reasonably request to facilitate the transfer of the Collateral as contemplated by this Agreement. Without limiting the foregoing, Borrower agrees and undertakes to execute all conveyances, assignments, confirmations, satisfactions, releases, powers, approvals,

consents and all other documents or papers necessary and appropriate to implement the terms and conditions of this Agreement as may be required from time to time by Lender or its counsel, or Lender's Nominee or its counsel in form and substance acceptable to Lender's counsel, or Lender's Nominee's counsel and to provide such further assurances as may be necessary or advisable in the opinion of the Lender or its counsel, or Lender's Nominee or its counsel, in order to further effectuate and confirm the conveyances made pursuant to this Agreement and otherwise carry out the intent of this Agreement.

(e)     Prior to Closing, Debtor shall cause that certain tank located on the Wolverine Gas & Oil Property, and more particularly described as follows to be pumped and the contents disposed of in accordance with all applicable laws and regulations: Tank into which the floor drain located in the shop/storage building empties.

11.     Representations and Warranties of Borrower.

(a)     Borrower and Guarantor represent and warrant to Lender and Lender's Nominee as follows:

(i)     The information and documents to be furnished to Lender pursuant to the terms of this Agreement will be true, correct, accurate and complete when made and as of Closing.

(ii)     Borrower owns the Real Property in fee simple absolute and is conveying it hereunder absolutely and free of any right of redemption or other right or interest of Borrower or anyone claiming through or under Borrower.

(iii)     Borrower holds good and valid title to the Personal Property and Intangible Property free and clear of any liens, encumbrances, or adverse claims, and Borrower has the right and authority to convey or assign to Lender all of the Personal Property and Intangible Property.

(iv)     Borrower is entering into this Agreement and executing the Deeds and other documents to be executed under the terms of this Agreement voluntarily and in good faith, without duress or undue influence of Lender.

(v)     The transaction provided for in this Agreement is not intended to hinder or delay any entity to which Borrower or Guarantor is or shall become indebted, and is not intended as a preference against any other creditor of Borrower or Guarantor. The Borrower, Guarantor and Lender agree that the nature and condition of the Collateral and the market conditions for the sale of such real estate and personal property in Alaska at the present time are such that it is difficult to determine the net proceeds the Lender

would receive from the Collateral if it chose to proceed with a foreclosure and sale of the Collateral.

(vi)    Neither the execution and delivery of this Agreement nor the other documents to be executed and delivered pursuant to the terms of this Agreement nor the consummation of the transactions contemplated by this Agreement will constitute a breach of any statute, law, regulation, ordinance or agreement to which Borrower is bound.

(vii)    All necessary corporate action has been taken to authorize Borrower, and Borrower has full power and authority, to enter into this Agreement and to consummate the transactions contemplated hereby.

(b)    The continued validity in all respects of the foregoing representations and warranties shall be a condition precedent to Lender's obligations to close.  If any of such representations or warranties shall not be correct at the time the same is made or as of the Closing, upon written notice from Lender to Borrower on or prior to Closing, this Agreement shall at Lender's sole election terminate and be of no further force or effect.  All representations and warranties contained in this Agreement shall be deemed remade as of the date of Closing and shall survive the Closing.

(c)    Borrower and Guarantor agree to indemnify, defend and hold Lender free and harmless from and against any and all losses, damages, costs and expenses, including legal expenses and attorneys' fees, incurred by Lender as a direct or indirect result of (i) breach or untruth of any representation or warranty of Borrower or Guarantor contained in this Agreement, of (ii) any breach or default by Borrower or Guarantor under any of its covenants or agreements under this Agreement.

12.    <u>Closing</u>.  Subject to the conditions precedent set forth in this Agreement, the closing of the transactions contemplated by this Agreement ("Closing") shall take place on or before April 23, 1999 (the "Termination Date").  The Closing shall be held at the office of First American Title of Alaska in Anchorage, Alaska, with First American Title of Alaska acting as escrow agent.  All parties shall retain all of their rights and remedies under applicable law and the Loan Documents until this transaction closes.

13.    <u>Conditions to Closing</u>.

(a)    Lender shall not be required to close the transactions provided for hereunder unless and until each and every one of the following conditions has been fulfilled:

PAGE _170/27_ EXHIBIT _A_

Exhibit _A_
Page _17_ of _20_

(i)    Borrower has deposited in the escrow any and all instruments and documents to be deposited by Borrower pursuant to this Agreement.

(ii)    Lender has received a commitment for a standard coverage owner's policy of title insurance covering all of the Real Property issued by a title insurer and insuring title to the Real Property in accordance with Paragraph 2(a). The cost of such commitment (and the title policy that will be issued pursuant thereto) shall be paid by Borrower.

(iii)    The pertinent title insurer has informed Lender that it is prepared to issue the Title Policy in the form required by this Agreement.

(iv)    Borrower has delivered to Lender all of the information, documentation and other items required by this Agreement and Borrower has satisfied and complied with all covenants and agreements contained herein.

(v)    All of the representations and warranties of Borrower contained in this Agreement are true and correct and Borrower has satisfied and complied with all covenants and agreements contained herein.

(vi)    Borrower has procured an executed Estoppel Certificate ("Estoppel Certificate,') from all of the tenants (if any) of the Property in a form acceptable to Lender in its sole and absolute discretion.

(vii)    Borrower has executed an Estoppel Affidavit pertaining to the conveyance of the Collateral to Lender or Lender's Nominee in a form acceptable to Lender in its sole and absolute discretion.

(viii)    Borrower has executed the Dealer Agreement.

(ix)    Guarantor has executed the Valdez Tesoro Station Note and Direct Dealership Agreement Guaranty.

(x)    Borrower and Guarantor have executed the Lease Termination Agreement, the Valdez Tesoro Station Note and the Valdez Tesoro Station Deed of Trust.

(xi)    All Net Sales Proceeds of the Propane Business Sales Agreement have been paid to Lender.

PAGE *18 of 27* EXHIBIT *A*

(xii)   Borrower has executed the mutual release provided for hereinbelow in Paragraph 14(c).

(xiii)   The Collateral shall be free and clear of any liens, security interests or encumbrances except as explicitly provided herein in Paragraphs 2(a) and (b).

(xiv)   Lender shall have received a commitment for a standard ALTA mortgagee's policy of title insurance issued by a title insurer and insuring title and the first priority of the Valdez Tesoro Station Deed of Trust to the New Station Property in accordance with Paragraph 9(d).   The cost of such a mortgagee's policy of title insurance shall be paid by Borrower.

(b)   Borrower shall not be required to close the transactions provided for hereunder unless and until each and every one of the following conditions has been fulfilled:

(i)   Lender has deposited in the escrow any and all instruments and documents to be deposited by Lender pursuant to this Agreement.

(ii)   Borrower has received a commitment for a standard coverage owner's policy of title insurance covering the New Station Property issued by a title insurer and insuring title to the New Station Property in accordance with Paragraph 9(d). The cost of such commitment (and the title policy that will be issued pursuant thereto) shall be paid by Lender.

(iii)   The pertinent title insurer has informed Borrower that it is prepared to issue the Title Policy in the form required by this Agreement.

(iv)   Lender has delivered to Borrower all of the information, documentation and other items required by this Agreement and Lender has satisfied and complied with all covenants and agreements contained herein.

(v)   All of the representations and warranties of Lender contained in this Agreement are true and correct and Lender has satisfied and complied with all covenants and agreements contained herein.

(vi)   Lender has delivered the Guaranty to Guarantor marked "satisfied" as provided in Paragraph 4(c).

(vii)   Lender's Nominee has executed a covenant not to sue in favor of Borrower and Guarantor pertaining to environmental liabilities with respect to the

following properties: (a) the Wolverine Gas and Oil Property, (b) the Old Station Property, and (c) the Benny James Property.

(viii) Lender has deposited an escrow sum in the amount of $95,000.00 to cover environmental liabilities pursuant to the Indemnity Escrow Agreement.

(ix)   Lender's Nominee has assumed the leasehold obligations described in Paragraph 2(g).

14.   <u>Provisions With Respect to Closing.</u>

(a)   At Closing, Borrower and Guarantor shall deliver to Lender or Lender's Nominee the following, all in form and substance satisfactory to Lender and Lender's Nominee:

(i)   The Deed, duly executed and acknowledged by Borrower, conveying to Lender or Lender's Nominee title to the Real Property in proper form for recording and subject only to the conditions of title permitted in this Agreement;

(ii)   The Bill of Sale, duly executed and acknowledged;

(iii)   The Assignment of Leases, duly executed and acknowledged;

(iv)   Any Estoppel Certificate required by Lender, duly executed and acknowledged;

(v)   A certificate by Borrower and Guarantor of them that all of their representations and warranties contained in this Agreement are true and correct as of the date of Closing;

(vi)   All Estoppel Affidavits requested by Lender duly executed and acknowledged;

(vii)   The Dealer Agreement duly executed and acknowledged.

(viii)   The Valdez Tesoro Station Note and Direct Dealership Agreement Guaranty duly executed and acknowledged.

(ix)   The Lease Termination Agreement, the Valdez Tesoro Station Note and the Valdez Tesoro Station Deed of Trust, duly executed and acknowledged.

Settlement and Conveyance Agreement      -18-

PAGE 200/27 EXHIBIT A

(x)    The Covenant Not To Compete duly executed and acknowledged.

(xi)    Titles to all titled vehicles duly endorsed transferring title of all such vehicles to Lender or Lender's Nominee; and

(xii)    Certified copies of a resolution of Borrower's Board of Directors authorizing Borrower's execution and performance of this Agreement and the agreements executed in conjunction herewith, all in a form acceptable to Lender in its sole and absolute discretion.

(b)    At Closing, Lender shall deliver to Borrower (1) a Deed to the Valdez Tesoro Station pursuant to the terms of the Lease Termination Agreement, and (2) a request for full reconveyance with respect to the Deed of Trust held by Lender covering the Slana Property and shall also endorse the Amended and Restated Promissory Note in accordance with Paragraph 4(c).

(c)    At Closing, the parties shall execute a mutual release in the form attached hereto as Exhibit L which shall release and discharge all parties and their agents, officers, directors, employees and attorneys from any and all claims, demands, damages, liabilities, or actions of any kind or nature whatsoever arising out of or in any way related to the Collateral, the Loan Documents, the Amended and Restated Promissory Note or the Distributor Agreement.

15.    Closing Costs.    All closing costs of any type or nature, including but not limited to title insurance premiums and recording fees shall be paid by Borrower, except that Lender shall pay for the title insurance premium related to the New Station Property. The parties shall split the escrow fees equally. All real property taxes due and payable with respect to the Collateral and the New Station Property shall be prorated as of Closing.

16.    Federal and State Excise Taxes.    All federal and state excise taxes for the sale of heating oil, propane, diesel fuel or gasoline that have accrued prior to April 23, 1999 shall be paid in full in cash by Borrower at Closing and Borrower shall defend, indemnify and hold Lender harmless of and from any such liabilities that accrued prior to April 23, 1999. Lender shall assume and pay all such excise tax obligations that accrued from and after April 23, 1999 ("post-effective date excise tax liabilities") and shall defend, indemnify and hold Borrower harmless of and from any such post-effective date excise tax liabilities.

PAGE 21 of 27 EXHIBIT A

17.    <u>Covenant Against Competing Tesoro Retail Service Station at Old Station Property</u>. Lender agrees that it will not construct or operate a Tesoro retail service station on the Old Station Property so long as Borrower or Guarantor or their heirs and assigns are (1) actively operating the Valdez Tesoro Station as a Tesoro branded retail fuel dealer or distributor and (b) are in full compliance with any agreements between any such parties and Tesoro Alaska Company or its successors and assigns.

18.    <u>No Merger</u>. The parties acknowledge and agree that the interest of Lender or Lender's Nominee in the Collateral under all of the conveyances provided for in this Agreement shall not merge with the interest of Lender in the Collateral under the Loan Documents. It is the express intention of each of the parties that such interests of Lender in the Collateral shall not merge, but shall be and remain at all times separate and distinct, notwithstanding any union of said interests in Lender at any time, and that the lien of Lender in the Collateral created by certain of the Loan Documents shall be and remain at all times a valid, subsisting and continuous lien on the Collateral.

19.    <u>Modifications, Waivers, etc</u>. The parties reserve the right to waive any of the conditions precedent to their respective obligations hereunder. No such waiver, and no modification, amendment, discharge or change of this Agreement, except as otherwise provided herein, shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment, discharge or change is sought.

20.    <u>Notices</u>. Any notice required to be given under the terms of this Agreement shall be in writing and hand delivered or mailed by United States first-class mail, postage prepaid, to the following addresses:

| If to Borrower or Guarantor: | P.O. Box 336 |
| | Valdez, Alaska 99686 |
| | |
| If to Lender: | 3230 C Street |
| | Anchorage, Alaska 99503 |

21.    <u>Successors and Assigns</u>. This Agreement shall be binding on the respective heirs, executors, administrators, successors, trustees and assigns of the parties hereto. Neither Borrower nor Guarantor may assign any of their respective rights or obligations hereunder to any person or entity without Lender's prior written consent. Lender, however, may assign all or any portion of its rights or obligations hereunder to any person or entity as Lender's Nominee, and may designate that the conveyances required of Borrower and Guarantor at Closing be made by Borrower or Guarantor to Lender's Nominee. All of the terms, covenants, conditions, representations, agreements and

Settlement and Conveyance Agreement        -20-

warranties contained herein shall survive the Closing of this Agreement and remain in full force and effect.

22.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Alaska.

23.    <u>Attorneys' Fees.</u>  If any party hereto brings suit to enforce his, her or its rights under this Agreement, or to recover damages for the breach thereof, the prevailing party shall be entitled to recover from the other party, the costs and expenses, including actual attorneys' fees reasonably incurred by it in connection with such suit and on appeal.

24.    <u>Time</u>.  Time is of the essence of this Agreement.  Any failure by any party to fully perform that party's obligations at or prior to the time required by this Agreement shall be conclusively deemed to be a material breach of this Agreement.

25.    <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts and by each party on a separate counterpart, each of which when so executed and delivered shall be deemed an original and all of which taken together shall constitute but one and the same instrument.

26.    <u>Captions</u>.  The paragraph headings used in this Agreement are for convenience of reference only and shall not affect the construction of any provision of this Agreement.

27.    <u>Gender and Number</u>.  Whenever appropriate to the meaning of this Agreement, use of the singular shall be deemed to refer to the plural and use of the plural to the singular, and pronouns of certain gender shall be deemed to comprehend either or both of the other genders.

28.    <u>Independent Legal Counsel, Financial and Tax Advice</u>.  Borrower and Guarantor have knowledge of the Alaska real estate market and are accustomed to dealing in commercial and real property transactions and financing, as well as knowledge of the petroleum products distribution business in Alaska.  The undersigned parties further acknowledge, represent and agree that they have read this Agreement and fully understand the terms hereof, and they have been fully advised by their legal counsel, financial advisors and tax advisors with respect hereto and that the same is executed by them upon advice and recommendation and with the approval of their independent legal counsel.

PAGE 23 of 27 EXHIBIT A

29.    Partial Invalidity.  If any term, covenant or condition of this Agreement is found by a court of competent jurisdiction to be invalid, unenforceable or of no effect, the remaining terms, covenants and conditions shall remain in full force and effect.

30.    Entire Agreement.  This Agreement and the Exhibits hereto together with the Deed, Bill of Sale and other documents executed in conjunction herewith constitute the final, complete agreement of the parties with reference to the subjects covered hereby.

31.    Cooperation.  Borrower and Guarantor hereby unconditionally covenant and agree that upon consummation of the transactions contemplated by this Agreement neither Borrower nor Guarantor will interfere with, nor oppose, Lender or Lender's Nominee with respect to any foreclosure proceeding, whether by court action or otherwise, or in any action to quiet title which may be brought by Lender or Lender's Nominee to perfect its right, title, and interest in and to the Collateral.  Without limiting the foregoing, Borrower agrees to cooperate with Lender in executing and filing any new or modified UCC-1 financing statements or UCC-3 modification statements arising from any post-Closing change in Borrower's name as a result of the terms of this Agreement.  Borrower shall as soon as practicable following closing cause its corporate name to be changed to Manumitted Companies, Inc. and will do business as the Valdez Tesoro Service Station.  Borrower will cooperate with Lender or Lender's Nominee in transferring all of its previous business names as provided herein to Lender or Lender's Nominee, including but not limited to consenting in writing to the assignment of such names to Lender or Lender's Nominee for purposes of reserving such business names under Alaska law.

LENDER:

TESORO ALASKA COMPANY, formerly known as Tesoro Alaska Petroleum Company

DATED:    April 23, 1999

By: _____
Its:    PRESIDENT

PAGE 24 of 37 EXHIBIT A

BORROWER:

HARBOR FUEL CO., INC., also known as
HARBOR FUEL COMPANY, INC., also
doing business as Wolverine Gas and Oil

DATED: April 23, 1999

By: _____
Its: _____

GUARANTOR:

DATED: _____April 23, 1999_____

_____
Benjamin H. Olds

STATE OF ALASKA

THIRD JUDICIAL DISTRICT

} ss.

THIS IS TO CERTIFY that on this 23rd day of April, 1999, before me, the undersigned, a Notary Public in and for the State of Alaska, personally appeared Stephen M. Ricks, known to me and to me known to be the individual named in and who executed the foregoing document, and he/she acknowledged to me that he/she was authorized to execute the foregoing document as President of TESORO ALASKA COMPANY, formerly known as Tesoro Alaska Petroleum Company, by authority granted him/her in the Bylaws or by resolution of the Board of Directors of said corporation for the uses and purposes therein set forth.

WITNESS my hand and notarial seal the day and year first hereinabove written.

OFFICIAL SEAL
STATE OF ALASKA
O.J. V///
NOTARY PUBLIC

_____
NOTARY PUBLIC in and for the State of Alaska
My Commission Expires: _____1/22/2001_____

PAGE 25 of 27 EXHIBIT A

Exhibit A
Page 25 of 26

STATE OF ALASKA

THIRD JUDICIAL DISTRICT    } ss.

THIS IS TO CERTIFY that on this __23rd__ day of ___April___, 1999, before me, the undersigned, a Notary Public in and for the State of Alaska, personally appeared ___Benjamin H. Olds___, known to me and to me known to be the individual named in and who executed the foregoing document, and he/she acknowledged to me that he/she was authorized to execute the foregoing document as __President__ of HARBOR FUEL COMPANY, INC., doing business as Wolverine Gas & Oil, by authority granted him/her in the Bylaws or by resolution of the Board of Directors of said corporation for the uses and purposes therein set forth.

WITNESS my hand and notarial seal the day and year first hereinabove written.

OFFICIAL SEAL
STATE OF ALASKA
D.J. WEBB
NOTARY PUBLIC

NOTARY PUBLIC in and for the State of Alaska
My Commission Expires: __1/22/2001__

STATE OF ALASKA

THIRD JUDICIAL DISTRICT    } ss.

THIS IS TO CERTIFY that on the 23rd day of ___April___, 1999, before me, the undersigned, a Notary Public in and for the State of Alaska, personally appeared BENJAMIN H. OLDS, known to me and to me known to be the individual named in and who executed the foregoing document, and he acknowledged to me that he signed and sealed the same as his free and voluntary act for the uses and purposes therein stated.

WITNESS my hand and notarial seal the day and year first hereinabove written.

OFFICIAL SEAL
STATE OF ALASKA
D.J. WEBB
NOTARY PUBLIC

NOTARY PUBLIC in and for the State of Alaska
My Commission Expires: __1/22/2001__

98089.04

PAGE 26 of 27 EXHIBIT A

Settlement and Conveyance Agreement        -24-

Exhibit A
Page 26 of 26