MANUMITTED COMPANIES, INC., vs. TESORO ALASKA COMPANY  
CASE NO. : A05-185CV (JKS)

DEPOSITION OF BENJAMIN H. OLDS, VOLUME II  
DECEMBER 12, 2006

Page 230

1  A   During the period of 93 and 94, Harbor Fuel was not
2      operating this station.
3  Q   Which station?
4  A   After 92 either. Ni -- during these three years,
5      Harbor Fuel was not -- did not either own or operate
6      that station.
7  Q   The Valdez Tesoro?
8  A   Correct.
9  Q   Who was operating the Valdez Tesoro?
10 A   Ken Dam.
11 Q   Okay. But he was one of the owners of Harbor Fuel
12     Company, correct?
13 A   Not at that time. He was the owner of that station at
14     that time.
15 Q   Oh, okay. So when you were selling fuel to the
16     station at that time, when did -- well, first of all,
17     when did that change?
18 A   That changed in, I think, early 92 if I remember
19     correctly -- or mid- 92 -- or -- yeah, early 92.
20 Q   Okay. So let me -- I m thoroughly.....
21         MR. MILLS: Yeah, I m not sure if you
22 understood his question.
23 A   Oh.
24         MR. MILLS: I think the question went to when
25 did Dam s ownership of that station change, I think, was the

Page 231

1  -- that question, not when Dam ceased to be a member of Harbor
2  Fuel.
3  Q   Correct.
4  A   Oh.
5          MR. MILLS: Okay. So the question is when did
6  Dam s ownership of the Valdez Tesoro change because.....
7  A   Oh, okay. So it would have been -- would have been
8      earlier than that, would have been 91-ish. It would
9      have been -- or when did we file bankruptcy?
10         MR. MILLS: Well, that -- I still don t
11 think -- he s saying you.....
12 Q   Well, let me -- let s start all over again.
13         MR. MILLS: Yeah, yeah, I think we re.....
14 Q   Okay.
15         MR. MILLS: I think you re getting.....
16 A   Oh.
17 Q   (By Mr. Berry) In 1992, did Harbor Fuel own the
18     Valdez Tesoro?
19 A   Well, to be technical, it never owned it. It was --
20     it was a separate company with common ownership called
21     Valdez Investment Corporation that owned it, so.....
22 Q   Okay. So was it identical ownership?
23 A   Yeah, it was -- it was.
24 Q   Okay. And the company -- at least as I unders --
25     well.....

Page 232

1  A   So -- and then that changed when -- near the end of
2      89, beginning of 90, Grothe and Oswald were bought
3      out of both companies which left Dam and Olds in both
4      companies. Then shortly thereafter, it would have
5      been at or about the filing date of the bankruptcy,
6      Dam didn t want to be part of the -- the bankruptcy so
7      he agreed that an equitable transaction would be the
8      exchange of stock of each company so that I would end
9      up being the owner of Harbor Fuel and he would be
10     the -- end up being the owner of Valdez Investment
11     Corporation.
12 Q   Okay. Which owned the Valdez Tesoro location.
13 A   Correct.
14 Q   Okay.
15 A   So at that point, we -- Harbor Fuel ceased to manage
16     that station and Mr. Dam began to manage it and we
17     assumed the function of a distributor.
18 Q   Okay. And so you charged the normal markup to sales
19     of gasoline to the Valdez Tesoro.....
20 A   Yes.
21 Q   .....during that period of time?
22 A   Yes.
23 Q   Okay. And when did Mr. Dam cease to be an owner or
24     operator of the Valdez Tesoro?
25 A   Well, he managed it in such a way that -- that when --

Page 233

1      that, you know, the sales went down. The -- or
2      declined steadily. He ended up with a balance -- an
3      account receivable due to Harbor Fuel of nearly what
4      the property was worth. We were coming up on a drop
5      dead date for underground storage tank upgrades and a
6      decision had to be made about what to do about this
7      situation and so I proposed to Mr. Dam that Harbor
8      Fuel take the property back for what the property was
9      worth in exchange for his trade payable and that s
10     what we did.
11 Q   And what was that trade payable, do you remember?
12 A   I believe it was $218,000 is the total value of the
13     trade back and forth but then Harbor Fuel was left to
14     tear down the station and remediate the site which we
15     did.
16 Q   Okay. And when was -- when did Harbor Fuels re-
17     acquire that Valdez Tesoro?
18 A   It was 94.
19 Q   Okay.
20 A   94.
21 Q   But it was certainly before Tesoro acquired the New
22     Town Chevron from the Chaffins or the Chaffins,
23     correct?
24 A   Shortly before, maybe two or three months.
25 Q   Okay.

Exhibit A  
Page 14 of 26

21 (Pages 230 to 233)

MANUMITTED COMPANIES, INC., vs. TESORO ALASKA COMPANY
CASE NO. : A05-185CV (JKS)

DEPOSITION OF BENJAMIN H. OLDS, VOLUME II
DECEMBER 12, 2006

### Page 238

1  right?
2  A  I mean, that was never -- that was never the problem.
3     He -- he knew he owned Harbor Fuel the money. He
4     didn't have any other way to pay it so this -- this
5     kind of friendly foreclosure is what happened.
6  Q  Okay. And is this friendly foreclosure part of the
7     reason for his claim in the current bankruptcy
8     proceedings?
9  A  Probably is.
10 Q  So he feels like you cheated him in some way?
11 A  He must.
12 Q  Okay. Were there any documents associated with this
13    transaction with Mr. Dam in 1995?
14 A  I believe it was done on a quitclaim deed and -- and
15    just transferred it all over to Harbor Fuel and we
16    took.....
17 Q  Did you ever receive any letters of complaint or
18    demand letters from Mr. Dam or from counsel retained
19    by Mr. Dam?
20 A  No.
21 Q  Never?
22 A  Well, I know he's filed this claim but I, you know, he
23    -- he would -- he would always -- would ex -- he --
24    express verbally to me that he, you know, had gotten
25    -- felt he was cheated but I -- you know, the.....

### Page 239

1  Q  But you squeezed him out, right?
2  A  Yeah.
3  Q  Okay. At any rate, you wanted the -- to -- the New
4     Town Chevron, is that a fair statement?
5  A  That I wanted it?
6  Q  Yes, you wanted to buy it.
7        MR. MILLS: When are you talking?
8        MR. BERRY: 1995.
9  A  I want -- I -- I wanted to improve.....
10 Q  (By Mr. Berry) Oh, you're go -- that's not the
11    question I asked. Let me -- so before you go down
12    that road, let me just ask you the question. You,
13    Harbor Fuels, wanted to acquire the New Town Chevron
14    from Mr. Chaffin in 1995, is that correct?
15 A  We were very interested in it.
16 Q  Okay. And that's why you went to the bank to find
17    financing for the acquisition. I believe you
18    testified to that earlier today. Do you remember
19    that?
20 A  Oh, I never went to the bank to get financing for the
21    station acquisition ever.
22 Q  You didn't?
23 A  No.
24 Q  Okay.
25 A  I went to the bank after the station acquisition.

### Page 240

1  Q  Okay. All right. But Harbor Fuels didn't have the
2     money to buy the New Town Chevron from Mr. Chaffin or
3     the Chaffin family, is that correct?
4  A  That's correct.
5  Q  So you needed help in the financing of that
6     acquisition, did you not?
7  A  Well, it -- the financing had to be figured out.
8  Q  Okay. Well, if Harbor Fuels didn't have it, you
9     personally didn't have it, correct?
10 A  Correct.
11 Q  You didn't go to a bank for financing, is that
12    correct?
13 A  Well, I didn't go -- I didn't go to the -- that -- I
14    didn't go that route because the very first thing that
15    I needed was approval from Tesoro to do this and it --
16    that approval is an -- is an important component of
17    the -- you know, as a distributor I wa -- I was
18    contemplating taking a station off the market that had
19    already been branded.....
20 Q  Right. Well, certain.....
21 A  .....and a branding, a -- and acquiring and branding a
22    station that had previously been Chevron.
23 Q  Okay.
24 A  So I sought Tesoro's approval first.
25 Q  Okay. But you also sought their help in financing the

### Page 241

1     acquisition, did you not?
2  A  I did. I mean, I think we, you know, we -- I don't
3     know whether I -- but I did. I did, I think. I don't
4     -- I don't know if we -- we mutually came to that
5     conclusion that that's the way it ought to happen or
6     whether I solicited it, I don't remember.
7  Q  Okay. I want to direct your attention to exhibit 13.
8     Can you tell me what this is, sir?
9        MR. MILLS: Just the one page?
10       MR. BERRY: No, 13 is the April 10th letter.
11    (Pause)
12 A  Sorry, your.....
13 Q  (By Mr. Berry) I'm just asking you what it is.
14 A  Oh, you're asking me what it is.
15 Q  Yeah. Well, it appears to be a letter from you to Cal
16    Level. Is that what it is?
17    (Pause)
18 Q  Sir, I don't mean to rush you but is -- do you
19    recognize this? Is this a letter from you April --
20    dated April 10, 1995 from you to Mr. Level?
21 A  I -- I guess it -- it is. I mean, I don't -- it is.
22 Q  Do you remember the letter?
23 A  I don't. That's why I'm taking so long to read it.
24 Q  Okay. Well, it's on -- I.....
25 A  I -- I believe it's -- it -- that I -- I probably

MANUMITTED COMPANIES, INC., vs. TESORO ALASKA COMPANY  
CASE NO. : A05-185CV (JKS)

DEPOSITION OF BENJAMIN H. OLDS, VOLUME II  
DECEMBER 12, 2006

Page 242

1    wrote this letter to him while we were going through
2    the spreadsheet exercising and explaining numbers to
3    each other.
4  Q  Okay. First of all, maybe you can comment on a few
5    things here. You make reference to a gasoline price
6    war in 93 and 94. Do you remember that?
7  A  I -- I do.
8  Q  And that s when Captain Joe s first came on the market
9    and was pretty aggressive with its pricing. Do you
10   remember that?
11 A  Yes.
12 Q  And, to the best of your knowledge, was Captain
13   Joe s -- you knew Captain Joe s was being supplied by
14   Service Oil and Gas, is that right?
15 A  Yes.
16 Q  Okay. And, by the way, in preparation for your
17   deposition today, sir, have you read or reviewed the
18   deposition of Mr. Chaffin, the deposition transcript?
19       MR. MILLS: I don t think Mr. Chaffin ever has
20 been deposed.
21       MS. LEUKUMA: Yeah.
22       MR. BERRY: Yes.
23       MR. MILLS: Was he? Chaffin was?
24       MS. LEUKUMA: Rob.
25       MR. BERRY: Yeah, Rob.

Page 243

1  A  Rob.
2       MR. BERRY: Rob was, yeah.
3       MR. MILLS: Oh, Rob is. I m sorry, Rob is --
4  was. I was thinking of a different last name. Sorry.
5       MR. BERRY: Oh.
6  A  Oh. I did not refresh myself reading that deposition.
7  Q  (By Mr. Berry) Okay. Were you -- I don t know if you
8    were present for that deposition.
9  A  I wasn t.
10 Q  Okay. Well, Mr. Chaffin, I believe, testified that
11   when -- if -- when Captain Joe s first came on the
12   market, it was very aggressive with its pricing and, I
13   guess, that would be consistent with your
14   recollection.
15 A  Yes.
16 Q  He testified that he was never able to beat Captain
17   Joe s pricing.
18 A  Correct.
19 Q  And that since Captain Joe s was first opened in 1993
20   or 94, it became kind of the price leader in the
21   Valdez market. Do you remember, is that consistent
22   with your recollection?
23 A  Yeah, you know, yes, for -- for periods of time, yes.
24 Q  Okay. Well, were there ever periods of time when you,
25   Harbor Fuels, or you, Manumitted, ever sold gasoline

Page 244

1    below what Captain Joe s was selling gasoline for?
2  A  No, but there were times when, you know, we
3    participated on Mr. Dam s behalf in, you know, in the
4    price structure for that price war.
5  Q  Okay. And Mr. Chaffin testified that it was Captain
6    Joe s that, essentially, drove the Big Wheel Texaco
7    out of business. Would that be consistent with your
8    observation of the market points?
9  A  I don t think that s -- no, I don t -- I don t think
10   that was -- I don t agree with that assumption.
11 Q  Okay. I m going to direct your attention back again
12   to exhibit 13.....
13 A  All right.
14 Q  .....and to the last full paragraph of the document.
15   It looks like your plan at the time was if you
16   acquired -- could acquire the New Town Chevron and
17   branded Tesoro, you would, one, obviously, reduce the
18   number of Tesoro outlets in Valdez, is that correct?
19 A  Ask me one more time.
20 Q  Okay. Well, obviously, one of your pla -- one of the
21   hopes was is that if New Town Chevron could be
22   acquired and branded Tesoro, it would, one -- first,
23   it would reduce the number of retail outlets in --
24   serving the Valdez market, is that correct?
25 A  Well, that would have been -- that was one of the

Page 245

1    effects of that, yeah. That s right, yeah.
2  Q  Okay. And that s one of the reasons why you wanted to
3    acquire the New Town Chevron, is that right?
4  A  Yes, it was -- yes.
5  Q  Okay. And that -- which would, obviously, be a
6    benefit to you.....
7  A  Yes.
8  Q  .....and you believed it would be a benefit to Tesoro
9    as well.
10 A  Exactly.
11 Q  Okay. Because now instead of four outlets, there
12   would only be three outlets serving the Valdez market,
13   correct?
14 A  Well, there would on -- only -- instead of three,
15   there would be two serving the down -- the downtown
16   Valdez.
17 Q  I m sorry, there would only be two, you and Captain
18   Joe s.
19 A  Right.
20 Q  And part two of the plan was is that you hoped also to
21   be able to replace Service Oil and Gas as the
22   distributor for the Captain Joe s outlet, did you not?
23 A  I don t know where that came from. I -- I don t
24   know -- I don t re -- you know, the.....
25 Q  Well, it s a document from your file, sir, that s

Exhibit A  
Page 16 of 218

24 (Pages 242 to 245)

MANUMITTED COMPANIES, INC., vs. TESORO ALASKA COMPANY          DEPOSITION OF BENJAMIN H. OLDS, VOLUME II
CASE NO. : A05-185CV (JKS)                                                         DECEMBER 12, 2006

Page 250

1  A    Not.....
2  Q    Okay.
3  A    Not in depth, no.
4  Q    Okay. And do you recall trying to convince Tesoro why
5       it would be in their best interest to do a lease
6       purchase op -- with a purchase option as a -- would be
7       a good thing from Tesoro s standpoint?
8  A    I -- I.....
9            MR. MILLS: I guess I just -- I think that s
10 contrary to what he just testified. I think he testified that
11 it was Tesoro s initiative on the lease purchase.
12 Q    (By Mr. Berry) Well, do your best to answer the
13      question. Maybe you ve already answered it.
14 A    Well, I don t -- you know, I don t know whether I ever
15      thought -- ever even thought I could convince them to
16      do that. We were working through this together and
17      once the -- by this time -- point in time, Tesoro
18      already owned this station. You know, or the deal had
19      been done with the Chaffins. It may not have been
20      closed but the deal -- by this time, the deal was
21      done. In fact, I think in -- by April, the contractor
22      was on site doing the upgrades.
23 Q    Okay. Well, do you know when.....
24 A    So the -- so there was really no convincing to be
25      done. We were trying to figure out what the

Page 251

1       transaction between us was going to look like.
2  Q    Okay. Well, let me just refresh your recollection,
3       first of all. Do you recall that the deal between the
4       Chaffins and Tesoro was finalized in May 23 of 1995?
5       Do you remember that?
6  A    I don t. I wasn t party to it and.....
7  Q    Okay. Did you ever see the document?
8  A    No, you -- you know, but I do know that an entire
9       upgrade was done to that station and we opened it on
10      July 1st and.....
11 Q    Of 2000 -- 1995?
12 A    .....and the -- and the contractor was removing snow
13      when he started the job. I m not sure exactly what
14      date they started but there -- there was a -- you
15      know, the -- the closing docu -- documents may not
16      have been signed but -- but the decision to buy that
17      station had already been made.
18 Q    Okay. Well, first of all, I think you may have
19      answered this question but did you ever see the
20      agreement between the Chaffin family and Tesoro?
21 A    No.
22 Q    Okay. Do you know what Tesoro paid for the property?
23 A    Well, I -- I knew what they were asking. I don t know
24      what they settled on so I don t know that.
25 Q    Okay. All right. You knew before Tesoro bought the

Page 252

1       property that the property was contaminated, is that
2       correct?
3  A    That s not correct.
4  Q    You didn t know that?
5  A    No.
6  Q    When did you find out that the property had been
7       contaminated prior or before Tesoro s operation?
8  A    I was never told at all. I -- the only reason I know
9       or -- or the only reason I knew about it was that I
10      was -- the contractors were using me as, quote, a
11      resource to get things that they needed around town so
12      I was on the job quite a bit when the upgrade was
13      happening and so it came down -- they -- they came
14      down to this -- this excavation came down to whether
15      or not they could dig the -- this small portion of
16      contaminated soil out from around a footing in the can
17      -- column on a canopy where this contaminated soil
18      encroached again in the fitting -- on the footing and
19      on the sidewalk on Meals Ave -- Avenue and a decision
20      had to be made about what to do about it and I -- I
21      heard about it from the contractor.
22 Q    Okay.
23 A    And I called the -- the guy that was handling it at
24      Tesoro, the construction, and told him that, you know,
25      if they needed to get a crane to hold the canopy up so

Page 253

1       they could dig that soil out, I could arrange it. I
2       mean, that that was my recommended way of -- of
3       dealing with this problem but they decided to treat it
4       in situ with microbes and -- and so here we are 10
5       years later and it s not cleaned up but that s how I
6       knew about it. I never knew about it -- I -- I never,
7       ever had it described to me in technical terms and
8       never, ever was party to the plan on how it was going
9       to be cleaned up.
10 Q    Okay. Well, let s put it this way, the property was
11      purchased by Tesoro in 1995, correct?
12 A    Yes.
13 Q    Okay. You wanted Tesoro to acquire the property.
14 A    Yes.
15 Q    And you wanted the opportunity, ultimately, to
16      purchase the property, correct?
17 A    Yes.
18 Q    You learned that it had been contaminated by the
19      Chaffin family and their operation before it was
20      acquired at some point, right?
21 A    I -- well, I learned that -- I learned that there was
22      contamination when the -- the company that was there
23      to clean it up told me about it and -- and I assumed
24      that it would -- was being cleaned up when and -- and
25      which it was or most of it was.

Exhibit A
Page 17 of 28

26 (Pages 250 to 253)

METRO COURT REPORTING
907.276.3876          745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501          metro@gci.net

MANUMITTED COMPANIES, INC., vs. TESORO ALASKA COMPANY
CASE NO.: A05-185CV (JKS)

DEPOSITION OF BENJAMIN H. OLDS, VOLUME II
DECEMBER 12, 2006

**Page 254**

1  Q  All right. So -- but, at any event, it was
2     contamination that took place before Tesoro bought the
3     property, correct?
4  A  I assume it was, yes.
5  Q  Okay. And you talked to Mr. Chaffin at first about
6     buying the property, did you not?
7  A  Well, I talked to his mother about it.
8  Q  Okay. Well, did she talk about not wanting to be
9     responsible for any environmental contamination?
10 A  No, but I know she was worried about whether or not
11    she would have to be responsible for it.
12 Q  Okay. So Tesoro wound up buying the property.
13 A  If there was any. She -- she didn't know.
14 Q  Okay. So Tesoro wound up buying the property in 1995
15    and the only way it could buy the property is if it
16    agreed to clean up -- be responsible for the
17    contamination that already existed on the property, is
18    that right?
19 A  Well, anyone would have had to do that, anyone who
20    bought it would have had to do that, I -- I believe,
21    or.....
22 Q  Or not buy it and make the Chaffins pay for it.
23 A  .....or -- or not buy it and make -- yes, right.
24 Q  So you got the benefit of the property that was being
25    cleaned up by Tesoro, correct?

**Page 255**

1  A  I haven't yet. It's never been cleaned up.
2  Q  Okay. Well.....
3  A  I mean, I've -- I've been -- in fact, I've got the
4     negative benefit of that you know, for years of not
5     being able to finance the property and not being able
6     to sell the property.
7  Q  All right. When you bought or when the property was
8     acquired in 1995, Tesoro incurred certain costs to
9     make improvements to the property, is that correct?
10 A  Yeah. Yeah.
11 Q  Installed new underground storage tanks?
12 A  No.
13 Q  You're sure about that?
14 A  I'm sure about that.
15 Q  Okay. So Mr. Chaffin in his testimony is inc.....
16 A  No -- no new tanks.....
17        COURT REPORTER: Wait a minute, you're over-
18 talking.
19 A  Oh, I'm sorry.
20 Q  So Mr. Chaffin when he's testified that's what they
21    did, he's incorrect?
22 A  He is incorrect.
23 Q  Okay. They installed new lines from the tanks to the
24    dispensers?
25 A  Correct.

**Page 256**

1  Q  They installed new dispensers?
2  A  Correct.
3  Q  They installed new trade dress?
4  A  Correct.
5  Q  Did they make any other improvements to the property?
6  A  They put new cathodic protection on the old tanks.
7  Q  Mm-hmm.
8  A  And they did some upgrades to the electrical system in
9     the building.
10 Q  Mm-hmm.
11 A  I think that's it.
12 Q  Okay. Do you know what Tesoro spent for the
13    improvements to the property in 1995?
14 A  I have no idea.
15 Q  Well, do you have a sense? I mean, you were there.
16    You saw the nature of the improvements. Do you have
17    an estimate of what they probably spent to make those
18    improvements?
19 A  Well, they probably spent what they -- what ultimately
20    transferred the property to me of $750,000.
21 Q  Okay. When did you first begin operating the
22    property, the new Chevron or the New Town -- what had
23    been the New Town Chevron property?
24 A  July 1st, 1995.
25 Q  Okay. And do you recall when the Big Wheel Texaco

**Page 257**

1     finally went out of business?
2  A  I don't.
3  Q  Was it not long after 1995?
4  A  It was -- well, it wasn't long after, it was -- he
5     came up against the underground storage tank problem
6     so it was probably -- I think, December of '95 would
7     have been the last -- possibly the last day he could
8     have gotten deliveries without upgrading.
9  Q  Now, when you leased the -- Harbor Fuels leased the
10    facility -- I'll just call it the New Chevron or the
11    New -- the Tesoro property -- did you have an
12    obligation to buy the property?
13 A  An obligation to buy it?
14 Q  Right.
15 A  You're talking about in the original lease document?
16 Q  Correct.
17 A  Well, it's -- I don't believe I did, I had an option
18    to buy it.
19 Q  Okay.
20        MR. MILLS: And I assume, counsel, you have a
21 document if he needs to refresh his recollection on that
22 point.
23        MR. BERRY: I'm going to give it to him right
24 now.
25        MR. MILLS: Thanks.

MANUMITTED COMPANIES, INC., vs. TESORO ALASKA COMPANY  
CASE NO.: A05-185CV (JKS)

DEPOSITION OF BENJAMIN H. OLDS, VOLUME II  
DECEMBER 12, 2006

Page 282

1        find someone to buy the business, correct?
2 A   Correct.
3 Q   And do you remember when those notes became due that
4        were executed in 2000 -- or, excuse me, 1992 or 1993,
5        I don't remember off the top of my head?
6 A   Well, they -- I know that -- I know that I was
7        surprised when I got my notice of default from Tesoro
8        because they -- they were set up to go on for a lot
9        longer and the amortization was, you know, and the
10      notes were set up with balloon payments built into
11      them that would allow for a reasonable monthly payment
12      rate during the amortization of the note and I don't
13      remember what the exact term of the notes were. I
14      believe they were 10 years.
15 Q   Okay. Well, let me ask it this way. Do you remember
16      in 1995 that the notes were rewritten and the term
17      extended?
18 A   No.
19 Q   Okay.
20 A   I -- I don't recall that but I'm not very well.....
21 Q   It -- you just don't remember.
22 A   Yeah, right. Right, I just don't remember.
23 Q   Yes, you just don't remember. You do remember though
24      that amounts were due -- came due under the notes --
25      or the note, I guess it was, by that time -- in

Page 283

1        February of 1998, is that right?
2 A   You're referring to these balloon payments?
3 Q   Exactly, yes.
4 A   Yes.
5 Q   Yes. Okay. And you -- did you -- is -- before that
6        became due in February of 1998, had you attempted to
7        find financing to refinance the notes or to take out
8        those notes?
9 A   Yes.
10 Q   Okay. But -- and that's what we talked about earlier,
11      you were unable to obtain that financing from the
12      bank, is that right?
13 A   Correct.
14 Q   Okay.
15 A   Because of the pollution.
16 Q   Pardon me?
17 A   Because of the pollution.....
18 Q   Right.
19 A   .....un -- unresolved pollution.
20 Q   Okay. And do you remember that in February of 1998,
21      Tesoro called in you in default because a balloon
22      payment hadn't been made. Is that -- do you remember
23      that?
24 A   I do very well.
25 Q   And do you remember that at that time, you also owed

Page 284

1        new monies for gasoline or unpaid product to Tesoro.
2        Do you remember that?
3 A   I remember that.
4 Q   And do you remember what that amount was?
5 A   That amount was -- well, it was somewhat -- it was --
6        I -- I don't remember the exact amount but it was
7        maybe $1.2 million or -- or thereabouts and.....
8 Q   And, again, the original notes were created because
9        you had been unable to pay Tesoro for gasoline and
10      diesel that you'd purchased from them, correct?
11 A   They were -- they were created as a result of the -- a
12      negotiated plan of reorganization.
13 Q   Right, Tesoro wrote down some of the debt but the debt
14      existed because you were unable to pay for gasoline
15      and diesel that had been purchased from Tesoro.
16 A   Correct, during the Valdez oil spill, yes. The Valdez
17      -- that's the Valdez.....
18 Q   Okay. And in 1998, you again owed Tesoro in excess of
19      a million dollars for gasoline and diesel that had
20      been purchased from Tesoro but you had been unable to
21      pay for, is that correct?
22 A   That's true although it had been, you know, that --
23      that amount had been steadily increasing over the
24      seven years since the plan of reorganization and I
25      think the day that that plan of reorganization was

Page 285

1        approved, Harbor Fuel was out of terms with Tesoro.
2 Q   Okay.
3 A   The day that the 95 station acquisition was signed,
4        Harbor Fuel was out of terms in the trade account with
5        -- with Tesoro and -- and it had been out of terms for
6        almost seven years but with the amount gradually
7        increasing over time.
8 Q   All right. In June of 1997, is it fair to say that
9        Harbor Fuels or Manumitted -- well, actually, Harbor
10      Fuels at that time -- was insolvent and had been
11      insolvent for a number of years?
12 A   I don't know, I'm not -- I guess I'm -- it could be in
13      the technical accounting sense. I'm not an expert in
14      that and -- and I don't think we ever ran any solvency
15      tests that are -- were generally-accepted accounting
16      -- accounting impacts.
17 Q   Okay. And what do you mean by the technical
18      definition?
19 A   Well, there are tests -- I -- you know, that I -- for
20      solvency that are quite involved but that seen
21      performed for other purp -- for tax purposes and --
22      and I -- I can't say that at any point along the way,
23      we were insolvent for -- for absolute certainty.
24 Q   Okay. Well, if your accountant, Mr. Letourneau, had
25      said on June 30, 1997 that the company wasn't solvent

Exhibit A  
Page 19 of 20

34 (Pages 282 to 285)

METRO COURT REPORTING  
907.276.3876     745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501     metro@gci.net

MANUMITTED COMPANIES, INC., vs. TESORO ALASKA COMPANY  
CASE NO. : A05-185CV (JKS)

DEPOSITION OF BENJAMIN H. OLDS, VOLUME II  
DECEMBER 12, 2006

Page 286

1  and it had been insolvent for the -- for some past
2  years, would you disagree with that?
3  A  Well, the company had a big lump of debt coming out of
4  the -- out of the first bankruptcy and -- and it could
5  very well have been. I -- I can t say one way or the
6  other.
7  Q  Okay. And in February of 1998, you began a long
8  period of negotiations with Tesoro that ultimately
9  resulted in a transaction dated April of 2000 -- or,
10  excuse me, April of 1999, is that right?
11  A  Yeah, we entered into that negotiation -- I think I
12  got a leb -- a letter in February asking me to go to a
13  meeting in April about that and -- and.....
14  Q  So those negotiations lasted for over a year long
15  period of time, is that correct?
16  A  It was a year before the documents were signed, yes.
17  Q  Okay. And did you have -- you had a series of
18  meetings with Tesoro?
19  A  I had maybe personally four or five meetings with
20  Tesoro over that period.
21  Q  Okay. And was your counsel present during those
22  meetings?
23  A  Yes.
24  Q  That would be Mr. Mills?
25  A  No.

Page 287

1  Q  Who would that be?
2  A  A gentleman named James McCollum.
3  Q  And what firm is Mr. McCollum with?
4  A  Bankston and McCollum.
5  Q  All right. Is he still there?
6  A  No, he s retired, isn t he?
7       MR. MILLS: He s got his own firm.
8  A  Oh.
9  Q  When did he retire, do you know?
10       MR. MILLS: He didn t retire, he has his own
11  firm.
12       MR. BERRY: Okay.
13       MR. MILLS: He left like -- I mean, I.....
14       MR. BERRY: Well, when did he leave?
15       MR. MILLS: He left about five years ago,
16  roughly.
17       MR. BERRY: Okay. Mark -- what are we on?
18       COURT REPORTER: Exhibit 17 marked.
19              (Deposition Exhibit 17 marked)
20  Q  (By Mr. Berry) Sir, I m handing you what s been
21  marked as exhibit 17. It s a e-mail, it looks like,
22  from Debbie Warner to John Letourneau. Have you seen
23  this before?
24  A  I have.
25  Q  Did you see it before to -- deposition today, in

Page 288

1  preparation for the deposition?
2  A  I saw it before today and in preparation for the
3  deposition.
4  Q  Okay. By the way, before today s deposition, did you
5  look at any documents aside from this document?
6  A  Before today s deposition?
7  Q  Or yesterday s.
8  A  Yeah, I looked at a lot of documents.
9  Q  Okay. And other than this one, do you recall
10  specifically any of them?
11  A  Well, I looked over the whole file that had been
12  transmitted from John Letourneau s office.
13  Q  Mm-hmm.
14  A  I looked over the whole gamut of documents that we had
15  produced. I looked over the amended complaint.
16  Q  Okay. Anything else?
17  A  You know -- oh, there s probably lots of them that I m
18  not mentioning but I went through them.
19  Q  Okay.
20  A  I didn t refresh myself on that stuff.
21  Q  I don t want to spend a lot of time with this but
22  Debbie indicates that our credit department friend,
23  Cal Level, at the San Antonio office is trying to
24  drive this deal and has been most fair. Do you agree
25  with that, that he was being fair in the negotiations?

Page 289

1  A  Well, he was fair -- he s -- he s fair in his approach
2  to things.
3  Q  Mm-hmm.
4  A  He -- he s a very easy guy to deal with and he was --
5  he was definitely appointed to drive the deal by
6  someone at Tesoro and -- and, you know, I ll -- I ll
7  never forget my first meeting with -- with Cal on this
8  -- this subject because I was quite surprised to
9  receive this default notice, especially with regard to
10  the trade -- you know, the -- the trade acro --
11  account and the -- because I d been talk -- you know,
12  during this period of -- of 95 through 99, I d speak
13  with Cal once a week and we d talk about the -- you
14  know, selling the station and we d talk about the --
15  paying down the two notes and there was no, you know,
16  telegraphing of this. I mean, it -- you know, the --
17  so -- so when I got the default letter, Ca -- Cal
18  asked me to come to Anchorage and meet with him and
19  discuss this deal and before the attorneys came in, we
20  -- Cal got me in a -- in a conference room with John
21  Cannon, sat me down and said look, you know, the --
22  you know, Tesoro s going to go another way. We re --
23  we re going to change our approach to marketing in the
24  state and -- and we re kind of going in the direction
25  of creating super-distributors and -- and, you know,

MANUMITTED COMPANIES, INC., vs. TESORO ALASKA COMPANY  
CASE NO. : A05-185CV (JKS)

DEPOSITION OF BENJAMIN H. OLDS, VOLUME II  
DECEMBER 12, 2006

Page 294

1  Q   The year ending June 30, 2001?
2  A   2000 and 2001, I believe -- I believe.
3  Q   Did it -- so.....
4  A   I also -- yeah, I think the -- it was one -- yeah, I
5      think -- yeah, it actually paid taxes a couple of
6      those years.
7  Q   Okay. So is that for two years, the year you.....
8  A   I believe so.
9  Q   Okay. Do you agree with this statement that Ms.
10     Warner writes in her June 4 memo to Mr. Letourneau,
11     Ben -- you -- is totally burned out and this job has
12     not been fun for him for the past nine years?
13 A   You're asking me what.....
14 Q   Do you agree with that? Is that accu -- is that.....
15 A   It bee -- it's not been an easy nine years, no -- you
16     know? The -- no, we were -- you know, we were -- we
17     were sending every dime to Tesoro; principle, interest
18     and trade account money that came in the door and --
19     and it was, you know, part of the plan of
20     reorganization. We committed to it, we were trying to
21     do it. And I did. I -- you know, I -- I didn't like
22     the whole idea of the -- you know, the pressure that
23     was being put on me to do this deal but it was -- it
24     was enticing to think about having a profitable, low
25     stress situation on the other side of the deal.

Page 295

1  Q   Okay. Now, do you remember that there were a variety
2      of documents that were signed or dated, at least,
3      April, I think, 23 of 1999? Do you remember that?
4  A   Yes.
5  Q   And do you remember various drafts of those documents
6      changing hands between your counsel and counsel for
7      Tesoro?
8  A   Yes.
9  Q   And Mr. Mills was handling those negotiations at that
10     time?
11 A   No, Mr. McCollum did the whole thing. I -- and Mike
12     was involved at some point.
13     MR. MILLS: I think Jim was out of town for a
14 week or two. I did a minimal amount but Jim McCollum was the
15 primary attorney handling it.
16     MR. BERRY: Okay. Well, I -- all I'm looking
17 at is I've got some drafts of agreements. I don't have all
18 the drafts but I have some drafts from you to Mr. Odson.
19     MR. MILLS: I don't know if I did those
20 documents or transmitted them.
21     MR. BERRY: Well, I don't want to turn you
22 into a witness here but.....
23     MR. MILLS: Suffice it to say that McCollum
24 was the lead attorney.
25     MR. BERRY: Okay.

Page 296

1      MR. MILLS: I don't deny having some
2  participation in the deal.....
3      MR. BERRY: Okay.
4      MR. MILLS: .....if that helps. I mean, we
5  both did it if -- you know, but I -- certainly, I -- me and
6  Jim did the lion's share.
7      MR. BERRY: Okay. All right. Well, actually,
8  that makes it easier for me now, so I.....
9  Q   (By Mr. Berry) All right. But, to the best of your
10     knowledge, a number of drafts of those documents
11     changed hands between counsel, is that correct?
12 A   Yes. Yes, and were -- there were quite a few, I
13     think.
14 Q   All right. And, as a result of that, I think we
15     talked about this before, the company received -- that
16     is, what became Manumitted received debt relief
17     income, is that right?
18 A   Well, re -- received debt relief income but, you know,
19     it -- it didn't receive full consideration for its
20     assets.
21 Q   I unders -- that's not the question I asked.
22 A   Right.
23 Q   So the company received debt relief income and by debt
24     relief income, I mean that the amount of debt realized
25     was greater than the value of the assets that were

Page 297

1      transferred.
2  A   In Tesoro -- Tesoro's opinion, it was. I d -- I --
3      you know, that -- the deal was back -- the deal was
4      simply backed in to fit the debt. There were not
5      realistic valuation numbers put to those assets.
6  Q   Okay.
7      (Pause)
8      MR. BERRY: Okay.
9      COURT REPORTER: Exhibit 18 marked.
10         (Deposition Exhibit 18 marked)
11 Q   Sir, I'm handing you what's been marked as exhibit 18.
12     Can you tell me what this is?
13 A   This is a letter from me to my -- our accountant, John
14     Letourneau trying to get him to give us a tax opinion
15     on the way the deal is structured at the moment and, I
16     guess, that characterizes it.
17 Q   And how about the -- with respect to the sale of
18     propane assets to Service Oil and Gas, how was that
19     value arrived at? Did you have discussions with
20     Service Oil and Gas directly?
21 A   No, I never -- I never had discussions with them
22     directly.
23 Q   Okay.
24 A   The -- I think the -- the first refusal right of
25     Suburban Propane was tendered and -- you know, so

MANUMITTED COMPANIES, INC., vs. TESORO ALASKA COMPANY  
CASE NO. : A05-185CV (JKS)

DEPOSITION OF BENJAMIN H. OLDS, VOLUME II  
DECEMBER 12, 2006

Page 302

1  A   But I didn t.
2  Q   All right.
3          COURT REPORTER:  Exhibit 20 marked.
4              (Deposition Exhibit 20 marked)
5          MR. BERRY:  Okay.
6  Q   Sir, you ve been handed what s been marked as exhibit
7      20.  I m confident you ve seen this document before,
8      correct?
9  A   Yes.
10 Q   Okay.  And this has gone through -- this one went
11     through various drafts between your counsel and
12     Tesoro s counsel, did it not?
13 A   Yes.
14 Q   And in the final analysis -- I won t go through this
15     in detail but, ultimately, you agreed to stipulate as
16     to certain facts in the recital section, did you not?
17 A   Yes.
18 Q   Okay.  And you signed this document, did you not?
19 A   I m sure I did.  I -- I don t see where it is.
20 Q   Okay.  Well, look for your signature.
21 A   Oh, there.  There.  Yes.
22 Q   Page 23?  And, actually, you signed it -- it was
23     notarized as well.  Your signature s notarized as
24     well, right?
25 A   Yes.

Page 303

1  Q   Direct your attention to paragraph 17 of this
2      document, exhibit 20.
3  A   Page 17?
4  Q   No, paragraph 17.
5  A   Oh, paragraph 17.
6  Q   Page 20.
7  A   Okay.
8  Q   Do you remember that paragraph?
9  A   Yes.
10 Q   Okay.  Now, do you remember that the original
11     agreement proposed by Tesoro contained no non-compete
12     provision?
13 A   The original of what?
14 Q   Version of the settlement and conveyance agreement
15     proposed by Tesoro contained no provision -- no
16     covenant against competition similar to paragraph 17.
17 A   So what you re asking me is that do I remember that an
18     earlier version of this document contained no covenant
19     not to compete?
20 Q   Did -- that s correct.
21 A   With respect to the properties -- the station
22     properties?
23 Q   That s correct.
24 A   I believe I do.
25 Q   Okay.  And that, in fact, paragraph 17 is a provision

Page 304

1      that was requested by you, was it not, or at least by
2      your side in the negotiations?
3  A   That s the way I remember it, yes.
4  Q   Do you recall whether your side had asked for a
5      broader non-competition provision other than just the
6      location across the street?
7  A   Well, we asked for a lot of things.  I don t -- I -- I
8      don t remember whether we asked for a broader non-
9      competition.  I don t know why we would but we -- we
10     asked for -- we asked for -- you know, we -- this --
11     this -- the reason we -- we did this was that we --
12     you know, we were transferring this asset to a
13     competitor and a potential competitor and.....
14 Q   And by competitor, you mean Service Oil and Gas,
15     correct?
16 A   The -- yeah, and I -- think -- yeah, but this really
17     doesn t have a context under a distributorship
18     agreement.  This -- this is -- had to do with a
19     property that had a gas station on it right across
20     from a gas station that I was about to buy.
21 Q   Okay.  But my question was do you recall -- and I
22     don t know whether it happened or not -- do you recall
23     whether your counsel had asked for a broader non-
24     competition?
25 A   I don t recall.

Page 305

1  Q   Okay.  In your discussions with Tesoro and negotiating
2      the terms of this agreement, did you ever request of
3      Tesoro a commitment from them or from Service Oil and
4      Gas that it would not compete or open up an additional
5      location in Valdez?
6  A   I m sure we did and I m sure that we got -- that we --
7      you know, we -- we asked for more clear
8      indemnification on the -- the environmental hazard
9      than we got but we got what we got.
10 Q   Right.  Okay.  Just to make sure I understand it.....
11 A   We were kind of over-barreled there.
12 Q   Well, I want to just make sure I understand this and,
13     again, I don t know whether this happened or not, I m
14     just -- but you recall asking from Tesoro a commitment
15     at both -- from both Tesoro and from Service Oil and
16     Gas that they would not open either together or in
17     combination a new gasoline retail facility in Valdez.
18         MR. MILLS:  Are you trying to re-state what
19 he s testified to?
20         MR. BERRY:  Yeah, I m trying to make sure I
21 understand.
22         MR. MILLS:  I don t think that s what he said.
23         MR. BERRY:  Okay.  That s what I thought he
24 said, so.....
25         MR. MILLS:  I don t -- I think he s testified

MANUMITTED COMPANIES, INC., vs. TESORO ALASKA COMPANY  
CASE NO. : A05-185CV (JKS)

DEPOSITION OF BENJAMIN H. OLDS, VOLUME II  
DECEMBER 12, 2006

Page 306

1  that he never dealt with Service Oil, period.
2    MR. BERRY: No, I understood that. He was
3  asking for that -- asking that commitment from Tesoro to
4  secure that commitment from Service Oil and Gas.
5    MR. MILLS: I guess you can ask him that
6  question. I'm not sure if he's testified to what you just try
7  to summarize.
8    MR. BERRY: Okay.
9  Q  (By Mr. Berry) Do you want me to.....
10 A  Well, I understand what you're asking but, you know, I
11    -- I believe that commitment was made back in the 95
12    deal, that we were looking at -- you know, we were
13    both agreed that there was a 15-year capitalization of
14    that station and that the relative -- and that -- and
15    that the relative position of the parties would stay
16    the same over that period and -- and there's --
17    there's -- you know, this deal -- the imbalance of
18    power was so great that we got very little of what we
19    asked for, very little.....
20 Q  Well, you did get a non.....
21 A  .....and so.....
22 Q  You did get a limited non-compete in the settlement
23    agreement under paragraph 17, correct?
24 A  Yeah, I believe.....
25 Q  And my question to you is did you ask for a broader

Page 307

1   non-compete?
2  A  I'm certain that we did.
3  Q  Okay. And Tesoro refused to provide it?
4  A  I don't know, that -- that would have been -- well, if
5     it's not in there, obviously, they did.
6  Q  Okay.
7  A  I mean, we were -- we were talking about committing
8     our cut -- you know, committing to debt and -- and to
9     the -- you know, the future income of that station and
10    it was a full-blown investment for us. I'm sure we
11    asked for a security of its situation.
12 Q  All right. Well, did -- during the negotiations, did
13    you ever consider giving up the station say?
14 A  I did.
15 Q  And did you ask to settle for that?
16 A  Yeah, we -- we asked them for a -- a look at a deal
17    that included that and -- and they didn't seem to be
18    interested in going that route.
19 Q  Was such a proposal ever exchanged between counsel, do
20    you know?
21 A  It would have been between counsel. It all would have
22    been between counsel.
23 Q  By the way, do you have drafts of all these
24    agreements, all the drafts that exchanged between
25    counsel's office or.....

Page 308

1  A  I doubt it. I -- I may have some but it was such a
2     mountain of paper that I -- that I think we just kept
3     chucking them out when we got them.
4  Q  And to the extent that I do have drafts that are from
5     Manumitted, those are from your own personal files,
6     those aren't from counsel's files, correct?
7  A  These?
8  Q  Yeah. I just want to confirm that. I just......
9  A  I -- I don't know. I -- I don't know where these are
10    from.
11 Q  Okay.
12 A  Do I?
13    MR. MILLS: Well, the -- this has got a TAC so
14 I.....
15 A  Oh, they are? Oh.
16    MR. BERRY: This one -- this is -- these are
17 the final documents but I have some drafts that you've
18 produced.
19 A  Oh, okay.
20    MR. BERRY: I can show you them if you want.
21 A  No, well, I believe it.
22    MR. BERRY: I was going to take you through
23 them.
24 A  Yeah.
25 Q  (By Mr. Berry) Most of them are from Mr. Mills to Mr.

Page 309

1  Odson and back and forth but I was just wondering
2  whether -- to the extent that they were produced from
3  your files, whether those are your personal file or
4  whether.....
5  A  Or that there were more.
6  Q  .....you -- all the drafts that may exist in counsel's
7     file have been produced as well. I don't think they
8     have been from Mr. Odson, I can tell you that right
9     now but I'm just -- you don't know?
10 A  I don't.
11 Q  Okay.
12 A  I don't know the answer to that question.
13 Q  All right.
14    COURT REPORTER: Exhibit 21 marked.
15    (Deposition Exhibit 21 marked)
16 Q  So I'm handing you what's been marked as exhibit 21.
17    It's one of the -- well, it's the signed version of
18    the deed of trust and assignment of rents. Do you
19    remember signing this document?
20 A  Well, I don't specifically but was this done at the
21    closing, this.....
22 Q  Yeah. Well, just see if that's your signature on the
23    end.
24 A  It is.
25 Q  Okay. And I'm going to direct your attention to

Exhibit A  
Page 23 of 26

MANUMITTED COMPANIES, INC., vs. TESORO ALASKA COMPANY  
CASE NO. : A05-185CV (JKS)

DEPOSITION OF BENJAMIN H. OLDS, VOLUME II  
DECEMBER 12, 2006

Page 318

```
 1        up the property were you to sell or to transfer the
 2        property?
 3   A    Well, it s my understanding that the duty to clean up
 4        that is a strict liability of -- of the entity that
 5        owns the property at the time that it s discovered and
 6        then -- and Tes -- and Tesoro took on that liability
 7        solely at the time of the lease.
 8   Q    Okay.
 9   A    And Harbor Fuel or Manumitted was never a party to
10        that and by asking for indemnity, we -- we asked for a
11        permanent indemnity that -- that -- you know, that s
12        what I asked for. It s, obviously, not what I got but
13        I don t know if that answers your question or not but
14        it s -- it was.....
15   Q    Well, let me.....
16   A    .....a point of disappointment, I can tell you, to not
17        have that indemnity transferred.
18   Q    Okay. Well, let me ask it this way. First of all,
19        did you ever provide this document, exhibit 24, to
20        Petro Star?
21   A    I believe that Bill Bankston did. I don t know that
22        for a fact but I believe he did.
23   Q    And when did.....
24   A    I know that he referred to this when he was trying to
25        negotiate the assignment of the indemnity.
```

Page 319

```
 1   Q    Okay. Do you know when Mr. Bankston provided this
 2        document to Petro Star?
 3   A    I m going to say that it had to have been in like the
 4        summer months of  03, like July or August of  03.
 5   Q    Okay.
 6   A    Or -- no, excuse me, 04 -- 0.....
 7   Q     04.
 8   A     04. Yes, excuse me, yeah.
 9   Q    But just to make sure I understand it, you did not
10        provide this document to Petro Star. If this
11        document, exhibit 24, was provided to Petro Star, you
12        believe it was provided by Mr. Bankston, correct?
13   A    Correct.
14   Q    Okay.
15        MR. MILLS: I think his testimony was he
16   wasn t sure but he thought.....
17   A    Might -- right, might, might.
18        MR. BERRY: Well.....
19        MR. MILLS: .....it might have been provided.
20   I don t think he said he was certain it was provided.
21        MR. BERRY: No, no, no, I -- that s right, I
22   said -- I -- let me just summarize again.
23        MR. MILLS: Okay. I just wanted -- I want to
24   make sure it wasn t overstated.
25        MR. BERRY: No, no, let me summarize again
```

Page 320

```
 1        just to make sure it s clear.
 2   Q    (By Mr. Berry) You, Mr. Olds, did not provide exhibit
 3        24 to Petro Star?
 4   A    Correct, I couldn t find them.
 5   Q    If anyone provide -- underline if anyone provided it
 6        to Petro Star, it would have been Mr. Bankston.
 7   A    Correct.
 8   Q    Okay. But you don t know whether he did or didn t?
 9   A    No.
10   Q    What s the next document you have in front of you?
11   A    Number 25, lease termination agreement.
12   Q    Okay. And this was a document which terminated the
13        lease that existed between Harbor Fuel Company and
14        Tesoro for the Valdez Tesoro property, is that
15        correct?
16   A    Yes.
17   Q    Was there ever a written dealership agreement between
18        Harbor Fuels and -- well, I guess it was, obviously,
19        Harbor Fuels that operated that property, right, after
20         95?
21   A    After  95, yeah.
22   Q    What s the next document you have in front of you?
23   A    Number 26, dealer agreement.
24   Q    Okay. And this is the dealer agreement that covers
25        the relationship between what is now Manumitted
```

Page 321

```
 1        Companies and Tesoro for the Valdez Tesoro station,
 2        correct?
 3   A    Yes.
 4   Q    Okay. And it appears to be substantially similar to
 5        the distributorship agreement you had had between
 6        Tesoro and Harbor Fuels. Did you ever -- did you
 7        observe.....
 8   A    I -- I noticed that there were similar provisions but
 9        I -- I never compared the two side by side.
10   Q    Okay. If you look again at paragraph one, there s a
11        reference to Tesoro being an in-state refiner,
12        uniquely qualified to provide the citizens of Alaska
13        with a dependable supply of quality products and, to
14        the best of your knowledge, do you know whether the
15        fuel that was supplied under this dealership agreement
16        was produced in Alaska by Tesoro?
17   A    Do I know whether it was produced?
18   Q    Right.
19   A    I have no reason to believe it wasn t.
20   Q    Was not?
21   A    Right.
22   Q    Okay. Now, in 1999 when you signed this agreement, do
23        you know how many direct dealer agreements Tesoro had
24        in the State of Alaska?
25   A    On the date that I signed this?
```

Exhibit A  
Page 24 of 26

43 (Pages 318 to 321)

MANUMITTED COMPANIES, INC., vs. TESORO ALASKA COMPANY  
CASE NO. : A05-185CV (JKS)

DEPOSITION OF BENJAMIN H. OLDS, VOLUME II  
DECEMBER 12, 2006

Page 330

1  traditional trade dress that was on your facility and
2  Tesoro -- the Valdez Tesoro -- how long had that been
3  the image of Tesoro in the State of Alaska, do you
4  know?
5  A  Well, we had the old -- we had the previous image on
6  the station when we took it over in 84 -- I mean, 85
7  so -- so how long had it -- or -- so.....
8  Q  Yeah, that look, that traditional look that was.....
9  A  Yeah, so I'd say at least -- or probably from 90 to
10  99 or something like that was -- was the Tesoro
11  Alaska -- the life of the Tesoro Alaska image.
12  Q  Okay. Do you think that image was well underst --
13  well known or recognized by Tesoro -- by Alaska
14  residents?
15  A  It -- it was after the nine years.
16  Q  Okay. All right. If you look at exhibit -- what
17  exhibit is the dealer agreement again? 26 is it?
18  A  Yeah.
19  Q  Look at paragraph five and this says you were going to
20  sell the products that are identified in exhibit A and
21  exhibit A identifies no products. Could you tell me
22  what products you sold at your station under this
23  agreement?
24  A  Unleaded gasoline, premium gasoline and.....
25  Q  Diesel.

Page 331

1  A  .....a mid -- there was a blended mid-grade and a plus
2  so an 87, a 90 and a 92 octane.
3  Q  All right. So there are three grades of gasoline,
4  regular, mid-grade, premium. Did you sell diesel as
5  well?
6  A  I did.
7  Q  As a branded product?
8  A  Well, it came through a branded pump.
9  Q  Right. Okay. Look at paragraph six of exhibit 26,
10  the dealer agreement.
11  A  Paragraph six of what?
12  Q  Paragraph six of exhibit 26 which is the dealer
13  agreement. Did you understand this provision to
14  provide that you did not have an exclusive territory
15  and that Tesoro was free to do business wherever it
16  chose to do business?
17  A  Yeah, I un -- I understood that these -- that the
18  verbiage was in this agreement and that, you know,
19  notwithstanding my expectation of them otherwise using
20  their discretion to reasonably meet our projections on
21  the -- on my station and -- the commitment I made to
22  that station.
23  Q  Okay. Were you aware of any provision in this
24  agreement now that it's a dealer agreement and that
25  you owned the facility, were you aware of any

Page 332

1  provision in the agreement that obligated Tesoro to
2  provide any maintenance to your station?
3  A  Well, it had -- in -- with res -- you asked me if I'm
4  aware if there's anything in this agreement that
5  obligates them to do any maintenance?
6  Q  Right.
7  A  I'm -- I'm not aware of any -- any verbal or any
8  verbiage in here that obligates them to do any -- any
9  maintenance.
10  Q  Okay. Do you know whether.....
11  A  Just a.....
12  Q  I'm sorry.
13  A  They had to additionally maintain the sign -- the
14  trade dress that they owned.
15  Q  Okay. Are you aware -- do you recall whether in your
16  negotiations with Tesoro, you had asked for explicit
17  promises from Tesoro to provide certain maintenance to
18  the facility?
19  A  That I had asked for explicit promises from them to do
20  maintenance?
21  Q  Right.
22  A  I don't believe I di -- ever did ask them for explicit
23  promises. I mean we did negotiate a -- from time to
24  time specific things that -- that they did at the
25  station.

Page 333

1  Q  Okay. Well, you certainly understood in April of 1999
2  that your counsel and Tesoro's counsel and Service Oil
3  and Gas's counsel had been involved in a period of
4  lengthy negotiations, correct?
5  A  True.
6  Q  And it finally reflected in a series of documents that
7  were signed by yourself, by Tesoro and some of them
8  were signed by Service Oil and Gas, is that correct?
9  A  Correct.
10  Q  And you understood that those documents were to govern
11  the relationship between the parties on a going
12  forward basis, did you not?
13  A  I did.
14  Q  Okay. And is it fair to say that as of 1999, your
15  relationship with Tesoro was adversarial?
16  A  That after nine -- 99?
17  Q  Yeah, at 99 -- in 99 when you signed this
18  agreements.
19  A  It was adversarial.
20  Q  You weren't looking out for them and they weren't your
21  friend at that point, correct?
22  A  Well, it was a -- it wasn't necessarily that, it was
23  that -- it was just an imbalance of power in that
24  transaction that -- that they had all the cards and
25  they had me over a barrel. I pretty much had to agree

Exhibit A  
Page 25 of 28

46 (Pages 330 to 333)

MANUMITTED COMPANIES, INC., vs. TESORO ALASKA COMPANY    DEPOSITION OF BENJAMIN H. OLDS, VOLUME II
CASE NO. : A05-185CV (JKS)                                DECEMBER 12, 2006

Page 366

1  MR. BERRY: That's right, that's the North
2  Pole refinery?
3  A    Right.
4       MR. MILLS: Yes, is just.....
5       MR. BERRY: All right. Could you mark this
6  real quickly?
7       COURT REPORTER: Exhibit 28 marked.
8                (Deposition Exhibit 28 marked)
9       MR. BERRY: Sorry, counsel, I don't have
10 another copy. I do but I don't know where it is. Probably in
11 this pile of garbage I threw on the floor.
12 Q   (By Mr. Berry) In any event, it's a copy of a motion
13     for summary judgment that was filed on your behalf in
14     the divorce proceedings. Do you remember --
15     obviously, you remember the divorce.
16 A   Yes. Yes.
17 Q   And you remember Sherry asking for an interest in
18     Manumitted, is that right?
19 A   Yes.
20 Q   And I just want to make sure I understand what was
21     going on here. If you look at page four of the motion
22     for summary judgment and it's talking about the 1999
23     transaction, it says the forgiveness of the Tesoro
24     debt created cashless income which resulted in a tax
25     liability for Harbor Fuel. Some of this income was

Page 367

1     offset by a deferred compensation obligation to Ben
2     Olds in the amount of $765,000 adopted and recognized
3     by the corporation. So I want to make sure I
4     understand this income that was received in nine --
5     this forgiveness of debt income that was received by
6     the company in 1999. Is the forgiveness of the debt
7     income received the difference between the values of
8     assets transferred to Tesoro and Service Oil and Gas
9     and the amount of the debt that was owed to Tesoro as
10    you understand it?
11 A   I guess the way I understand it is -- the only way I
12    understand it is the -- is the way that John
13    Letourneau's laid it out.
14 Q   Okay. Which is.....
15 A   Well, didn't we go over that document already or
16    yesterday? But it -- it's -- I don't know if I would
17    have it.
18    MR. MILLS: I don't think it's part of the
19 exhibits that I recall but Letourneau, in some of the
20 materials that were turned over to Tesoro, I think there was
21 some calculations by Letourneau.
22 A   Ye -- yeah. Okay.
23 Q   (By Mr. Berry) Well, as I understand it -- I mean,
24    just tell me if you understand it this way, that the
25    forgiveness of debt income is the difference between

Page 368

1     the amount of the debt and the value of the assets
2     that were transferred. Is that how you understand it?
3  A   I'd have to say I don't understand it. I -- you know,
4     I mean, the -- that -- there was a fairly complex
5     calculation he did to arrive at that. I think in
6     simple terms, that's what it is but whether it is
7     under the tax rules or not, I don't know.
8  Q   Okay. And let me just show you this.
9  A   Oh, that's it right there.
10 Q   Okay.
11     MR. BERRY: Why don't you mark this?
12     COURT REPORTER: Exhibit 29 marked.
13              (Deposition Exhibit 29 marked)
14 Q   I'm going to hand you what's been marked as exhibit
15    29. It's -- well, it's documents THG-0706 through
16    709. Is this a document that your accountant's
17    prepared, do you know, or did you do this?
18 A   This is not something I did.
19 Q   Do you understand.....
20 A   This is something that either.....
21 Q   Debbie Warner did?
22 A   Debbie or John Letourneau, right.
23 Q   John Letourneau did? Okay. Is -- this document seems
24    to indicate at the bottom a gain to the company in the
25    amount of $1.47 million. So you don't know where that

Page 369

1     number comes from?
2  A   Well......
3  Q   And that would be the difference between the fair
4     market value for the assets conveyed versus the book
5     value of the assets?
6  A   (No audible response).
7  Q   If you don't know what this is, that's fine, just tell
8     me.
9  A   Well, yeah, I -- I don't know.
10 Q   Okay.
11 A   I -- I really don't.
12 Q   In connection with the dissolution from Sherry, did
13    you have your deposition taken?
14 A   I believe I did.
15 Q   Okay. And do you remember being asked questions about
16    the value of Manumitted Companies at that time?
17 A   I don't really remember it but I'm sure I did.
18 Q   Okay. Do you have a transcript from that deposition?
19 A   I don't. Well, I -- I don't know whether I do or not,
20    I'd -- I'd have to -- I don't know.
21 Q   Okay. Do you remember telling Mr. Letourneau that you
22    valued the company in 2000 at $140,000?
23 A   In 2000?
24 Q   Yeah.
25 A   No.

Exhibit A
Page 20 of 20